**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEX AND ANI, LLC, *et al.*,[1] | ) Case No. 21-10918 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF ROBERT TRABUCCO, CHIEF**
**RESTRUCTURING OFFICER OF ALEX AND ANI, LLC, IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert Trabucco, hereby declare under penalty of perjury:

**Preliminary Statement[2]**

1.       Alex and Ani commences these chapter 11 cases to deleverage its balance sheet and continue as a going concern with the support of 100 percent of its first, second, and third lien lenders, and 100 percent of its equity holders. This level of support in the face of significant operating headwinds is a testament to the importance and future of the Company.

2.       Founded in 2004 by Carolyn Rafaelian, Alex and Ani has become a premier jewelry brand, quickly gaining popularity because of the novel and customizable nature of its signature expandable wire bracelet. Alex and Ani has been headquartered in East Greenwich, Rhode Island since 2014. Since opening its first retail store in Newport, Rhode Island in 2009, Alex and Ani has expanded to over 100 retail store locations across the United States, Canada, and Puerto Rico.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Alex and Ani, LLC (8360); A and A Shareholding, Co., LLC (7939); Alex and Ani International, LLC (2247); Alex and Ani Retail, LLC (1227); Alex and Ani Assembly, LLC (3215); Alex and Ani California, LLC (6368); Alex and Ani Canada, LLC (3317); Alex and Ani Puerto Rico, LLC (1477); and Alex and Ani South Seas, LLC (8592). The Debtors' headquarters and mailing address is: 10 Briggs Drive, East Greenwich, RI 02818.

[2]     Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to such terms elsewhere in this Declaration.

Alex and Ani also maintains a vibrant and growing e-commerce presence.  With a loyal customer base, Alex and Ani operates as a symbol of spiritual wellness and connectivity that seeks to highlight the individuality of each of its customers.

3.      Alex and Ani has recently suffered from adverse macro-trends driving customers away from brick-and-mortar retail, like many other retailers.  Moreover, Alex and Ani's explosive growth in the early 2010s resulted in certain operational challenges as the Company's existing infrastructure struggled to keep up with demand for its products, and significant turnover in management disrupted key business relationships.

4.      In late 2018, the Company, its then-existing lenders, Ms. Rafaelian (the then-majority equity owner), and Lion Capital (the then-minority equity owner) engaged in restructuring negotiations in the face of the default and acceleration of its credit facility and the suspension of access to its revolving credit facility.  The lenders, led by then-administrative agent Bank of America, ultimately agreed to waive all outstanding defaults and subordinate a portion of the secured facility to a new $20 million second lien facility provided by Lion Capital and an entity owned by Ms. Rafaelian.  In connection with the transactions, which closed in September 2019 (the "2019 Restructuring"), Ms. Rafaelian stepped down as Chief Executive Officer and I was subsequently appointed Chief Restructuring Officer and Interim Chief Executive Officer.  Lion Capital became the Company's majority shareholder.

5.      Shortly after closing the 2019 Restructuring, the COVID-19 pandemic forced the Company to close all of its stores in the spring of 2020, resulting in a massive drop in revenue. The Company took immediate steps in response, including furloughing employees and otherwise minimizing operating expenses.  Continued depressed revenues, however, coupled with the

Company's ongoing lease obligations throughout the pandemic, placed significant stress on the Company's ability to operate and service its debt obligations.

6.     In 2020 and 2021, the Company once again defaulted under the Bank of America-led credit facilities.  Following discussions with the Company's lenders, it became clear that the lenders were unwilling to continue supporting the Company as a going concern.  As a result, Lion Capital engaged in discussions with the lenders that ultimately led to the consummation of a transaction to acquire all of the Company's outstanding first and third lien obligations.

7.     Simultaneously with these negotiations, the Company and Lion Capital began negotiating the terms of a restructuring support agreement (the "RSA"), attached hereto as **Exhibit A**.  The RSA contemplates, among other things, a standalone restructuring and dual-track marketing process, supported by consensual access to cash collateral.  While these negotiations were ongoing, the Company, Lion Capital, and Ms. Rafaelian negotiated a comprehensive settlement agreement of all outstanding disputes (the "Settlement").  The Settlement, as incorporated into the RSA, provides for, among other things:  (a) Ms. Rafaelian's sale of her 35 percent interest under the Second Lien Credit Facility to The Bathing Club LLC (the "Purchaser"); (b) Lion Capital's sale to Purchaser of 35 percent of the face amount of the first lien obligations under the First and Third Lien Credit Agreement; (c) the dismissal and withdrawal of certain outstanding litigation with prejudice; and (d) mutual releases.  The Settlement is subject in all respects to Bankruptcy Court approval.

8.     The key terms of the restructuring are as follows:

- **Debt for Equity Conversion**.  A "toggle" plan, whereby the Company will pursue a stand-alone restructuring backed by the Support Parties contemporaneously with the sale process in the event that the sale process is unsuccessful.

- **Marketing Process**.  A 60-day public marketing process for the sale of some or all of the Company's assets (the "<u>Sale Transaction</u>") in accordance with the terms of the Bidding Procedures.

- **Cash Collateral**.  Consensual access to cash collateral in exchange for certain customary adequate protection for existing secured creditors, and prosecution of these cases in accordance with the milestones set forth below.

- **Milestones**.  Prosecution of these cases in accordance with the following timeline:

  o   entry of the Interim Cash Collateral Order within five days of the Petition Date;

  o   occurrence of the Initial Bid Deadline within 28 days of the Petition Date;

  o   the Court holding a hearing regarding approval of the Disclosure Statement Order, Bidding Procedures Order, and the Final Cash Collateral Order within 40 days of the Petition Date;

  o   entry of the Disclosure Statement Order, Bidding Procedures Order, and the Final Cash Collateral Order within 42 days of the Petition Date;

  o   occurrence of the Final Bid Deadline within 60 days of the Petition Date;

  o   holding an auction pursuant to the Bidding Procedures Order within 67 days of the Petition Date;

  o   the Court holding a hearing regarding entry of the Confirmation Order or approving the Sale Transaction within 78 days of the Petition Date;

  o   entry of the Confirmation Order or the Sale Order, as applicable, within 80 days of the Petition Date; and

  o   occurrence of the plan of reorganization's effective date within 95 days of the Petition Date.

- **Lease Rejection**.  Evaluation of the Company's existing lease portfolio and rejection of uneconomic leases to rebalance the Company's lease portfolio.

- **Settlement of Existing Litigation**.  Subject to approval of the Settlement, Ms. Rafaelian, on the one hand, and the Company and Lion, on the other, will provide mutual releases.

9.     The key to achieving the restructuring is speed and cooperation.  In an ever-shifting

retail landscape that has seen dozens of casualties in recent years, Alex and Ani will work

collaboratively with all parties in interest to ensure that it remains a going concern for many years to come.

## Background

10.    I am the Chief Restructuring Officer of Alex and Ani, LLC, a limited liability company organized under the laws of Rhode Island and one of the above-captioned debtors and debtors in possession (collectively, "Alex and Ani," or the "Company"). I have served in this role since September 2019.

11.    I was appointed Chief Restructuring Officer of Alex and Ani in September 2019 in connection with the 2019 Restructuring (as discussed further herein). Prior to joining Alex and Ani, I was Chief Financial Officer of Sterling Jewelers, Inc. from 2003 to 2016. Before joining Sterling Jewelers, Inc., I served as a retail consultant for several years, and prior to that, served as Chief Financial Officer and then Chief Operating Officer of NordicTrack. I have a Master of Science in Business Administration/Accounting from the University of Massachusetts Amherst, a Master of Arts in Economics from Boston College, and a Bachelor of Science from Babson College.

12.    I am generally familiar with the Company's day-to-day operations, business, financial affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (a) the Company's petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed with the Bankruptcy Court for the District of Delaware (the "Court") on June 9, 2021 (the "Petition Date"); and (b) the various types of emergency "first day" relief that the Company has requested pursuant to the motions and

pleadings filed contemporaneously herewith (collectively, the "First Day Motions"), including the

Bidding Procedures Motion and the Cash Collateral Motion, each as further described herein.

13.    Except as otherwise indicated herein, all facts set forth in this Declaration are based

upon my personal knowledge of the Company's employees, operations, and finances, information

learned from my review of relevant documents, information supplied to me by other members of

the Company's management and its advisors, or my opinion based on my experience, knowledge,

and information concerning the Company's operations, financial affairs, and restructuring

initiatives.  I am over the age of 18 and am authorized to submit this Declaration on behalf of the

Company.  If called upon to testify, I could and would testify competently to the facts set forth in

this Declaration.

14.    To familiarize the Court with the Company, its business, the circumstances leading

to these chapter 11 cases, and the relief the Company is seeking in the First Day Motions, I have

organized this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history and operations;

- **Part II** provides an overview of the Company's prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Company's RSA and proposed restructuring and sale process; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

I.       **The Company's Corporate History and Business Operations.**

A.       **Corporate History.**

15.       Alex and Ani was founded by Carolyn Rafaelian in 2004 as a small jewelry company selling wire charm bracelets and manufacturing jewelry for private labels.  Ms. Rafaelian and her sister followed in the footsteps of their father, who owned a jewelry factory, Cinerama, Inc. ("<u>Cinerama</u>"), in Cranston, Rhode Island.  At the time of its founding, the Company operated out of Cinerama's basement.  The Company channeled


The iconic bangle bracelet.

Ms. Rafaelian's spiritual energy and ethos, and Alex and Ani's jewelry was soon known as a symbol of spiritual well-being and empowerment.  The Company grew significantly beginning in 2010 to a valuation of over $1 billion in 2014; Ms. Rafaelian was ranked by Forbes as one of America's richest self-made women in 2017.  In less than a decade, the Company:

- increased the number of bracelets sold to nearly 10 million bracelets per year;

- expanded from less than two dozen to over 1,000 employees;

- partnered with national department stores to carry the Alex and Ani line; and

- opened more than 100 retail stores.

Alex and Ani's explosive growth in the early 2010's was driven by its dedicated customer base, expansive offerings through partnership with brand-loyal followings, and the stackability of its patented wire bracelets.

A.    **The Company's Brand and Products.**

16.    The Company's signature bracelets consist of a slim adjustable wire loop adorned



with customizable charms, making each piece adjustable and "one size fits all."  Customers are encouraged to buy charms that reflect the wearer's identity or interests, and combine bracelets to form unique pairings.  The Company also offers a wide array of other jewelry products including rings, necklaces, and hoop earrings.

17.    The Company holds over 70 domestic and international patents related to its jewelry and design, including for its iconic expandable wire metal bracelet.  The Company also owns several trademarks, including Alex and Ani®, as well as the related trademark and service mark rights.



18.    As part of its marketing strategy, the Company partners with well-established brands and charities to create exclusive pieces featuring its partners' trademarks and logos. The Company currently has over 50 brand partners and is party to over 50 licensing agreements, including with Mattel, Major League Baseball, Warner Brothers, and certain charity partners, including UNICEF and Mark-A-Wish America, among others. These partnership pieces are not only popular with the Company's existing customers, but are also instrumental in allowing the Company to reach new audiences. The Company's brand partnerships and licensing agreements are critical to the





Company's business, representing approximately 19.5 percent and 22.5 percent of the Company's revenue for the year ending January 2020 and January 2021, respectively.

**B.      The Company's Business Operations.**

**1.      Brick-and-Mortar Presence.**

19.      The Company is party to approximately 74 leases for stores across the United States, Canada, and Puerto Rico.   Approximately 25 of the Company's leased locations are currently closed as a result of the COVID-19 pandemic.   The Company's brick-and-mortar segment generally has been unprofitable since early 2020 due to the industrywide challenges faced by brick-and-mortar stores.



**A standalone Alex and Ani store**

20.      The Company also has partnered with many national department stores, such as Neiman Marcus, Bloomingdale's, Nordstrom, Nordstrom Rack, and Dillard's, and over 300 small independent retailers to display and sell its branded jewelry line.   The Company's sales to its authorized retail partners, which are at wholesale prices, comprised approximately 43 percent of the Company's total consolidated sales in 2019, which was the Company's last full fiscal year operating all stores.

### 2.    The E-Commerce Platform.

21.    The Company has maintained a robust and interactive online presence over the last several years.  Today, approximately 45 percent of the Company's total sales originate through e-commerce.  Online sales are conducted primarily through the Company's brand-specific website, alexandani.com.



22.    On the Company's website, shoppers can purchase merchandise and find fashion advice, trends, quizzes, style pointers, and blog posts.  The Company recently began offering certain personalization options on its website, which allow customers to create personalized bracelets and necklaces by purchasing and combining a variety of charms or ordering custom-engraved jewelry.  The Company's website is a critical tool for educating existing and potential customers about its products, driving traffic to its stores, and creating a sense of community with its followers.

### C.    Critical Components of the Company's Cost Structure.

### 1.    Supply Chain, Manufacturing, and Production Processes.

23.    Each piece of Alex and Ani branded jewelry is designed, engineered, and assembled in America.  The Company sources nearly 100 percent of its products' component parts domestically, largely from Rhode Island businesses.  The Company is vertically integrated and

maintains a supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to its customers. In addition, the Company has certain strategic alliances with local manufacturers who provide finished goods to the Company's specifications. The Company's products are generally stored, assembled, packaged, and shipped from the Company's combined headquarters and distribution center in East Greenwich, Rhode Island, although the Company occasionally contracts assembly and packaging services to third-party providers.

### 2.    Employee Compensation and Benefits.

24.    As of the Petition Date, the Company employs approximately 524 employees, including an estimated 279 full-time employees and an estimated 245 part-time employees. None of the employees is covered by a collective bargaining agreement. The Company offers its employees the opportunity to participate in a number of insurance and benefit programs, including, among other programs, medical, dental, and vision plans, life insurance, disability insurance, workers' compensation, paid time off, and other employee benefit plans.[3] The Company's workforce-related obligations, including wages and benefit-related obligations, total approximately $2 million per month.

### 3.    Leased Real Estate Obligations.

25.    The Company leases all of its store locations and offices, including its combined headquarters and distribution center in East Greenwich, Rhode Island. The aggregate annual occupancy costs of its current lease footprint is approximately $12.7 million.

---

[3]    Further details regarding the Company's workforce and wage and employee benefit-related obligations are described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* filed contemporaneously herewith.

26.      Before the Petition Date, the Company's management team and advisors undertook an extensive analysis of the Company's existing store footprint to determine if (and how many) stores the Company should permanently close in connection with its broader financial and operational restructuring initiatives.  The Company ultimately determined that it was advisable to permanently close 37 store locations that the Company determined in its business judgment were unprofitable under the current lease terms, including 12 store locations for which the applicable lease had terminated or expired as of the Petition Date and an additional 25 store locations that were closed as of the Petition Date.  The Company will file a motion seeking authorization to reject certain leases in connection with the store closings, and further describe its analysis supporting such relief, shortly after the commencement of these cases.

**II.    The Company's Prepetition Corporate and Capital Structure.**

27.    The Company's corporate enterprise consists of nine debtor entities.[4]    An illustration of the Company's corporate structure is set forth below.



28.    The Company has approximately $127.4 million in the aggregate principal amount of outstanding funded debt obligations, including capitalized interest, consisting of approximately $20.4 million under the First Lien Credit Facility, approximately $25.2 million under the Second Lien Credit Facility, and approximately $81.8 million under the Third Lien Credit Facility.  The current capital structure results from the Company's 2019 out-of-court restructuring, which subordinated a portion of its existing debt to the new Second Lien Credit Facility, thereby creating

---

[4]    The nine debtor entities are Alex and Ani, LLC, A and A Shareholding Co., LLC, Alex and Ani Retail, LLC, Alex and Ani International, LLC, Alex and Ani California, LLC, Alex and Ani Assembly, LLC, Alex and Ani Canada, LLC, Alex and Ani Puerto Rico, LLC, and Alex and Ani South Seas, LLC.

the "synthetic" Third Lien Credit Facility.  The following table summarizes the Company's outstanding funded debt obligations as of the Petition Date:

| Funded Debt | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| First Lien Credit Facility | January 31, 2022 | $20.4 million |
| Second Lien Credit Facility | January 31, 2022 | $25.2 million |
| Third Lien Credit Facility | January 31, 2022 | $81.8 million |
| Total | | $127.4 million |

29.    In addition to funded debt obligations, the Company has outstanding unsecured trade debts (*e.g.*, amounts owed to trade vendors, suppliers, landlords) that total approximately $29.1 million as of the Petition Date and other contingent and unliquidated unsecured obligations related to outstanding litigation.

### A.    The First Lien Credit Agreement.

30.    The Company entered into that certain Credit Agreement, dated as of January 29, 2016 (as amended, restated, or otherwise modified from time to time prior to September 13, 2019, the "First Lien Credit Agreement"), by and among Alex and Ani, LLC, as the borrower (the "Borrower"), A and A Shareholding Co., LLC, as "Holdings", the Company guarantors party thereto from time to time (collectively, and including A&A Shareholding Co., LLC, the "Guarantors"), Bank of America, N.A., as administrative agent (in such capacity, prior to the succession by Wilmington Trust, National Association, described below, "Bank of America"), and the other lenders party thereto from time to time (the "First Lien Lenders").  At the time of its issuance, the First Lien Credit Agreement provided for a $175 million senior secured first lien term

loan facility (the "First Lien Term Loans") and a $30 million senior secured first lien revolving credit facility (the "Revolver," and together with the First Lien Term Loans, the "First Lien Credit Facility"), each secured by a first priority lien on substantially all of the assets of the Borrower and Guarantors, subject to certain exclusions (collectively, the "Collateral").

31.     On September 13, 2019, in connection with the 2019 Restructuring, the First Lien Credit Agreement was amended (such amended First Lien Credit Agreement, as further amended, restated, or otherwise modified from time to time, the "First and Third Lien Credit Agreement") to allow Lion Capital (as defined in the First and Third Lien Credit Agreement) and Alex and Ani Pledge Co. (an entity owned by Ms. Rafaelian) ("A&A Pledge Co.") to provide $20 million of additional capital to the Company secured by a second priority lien on the Collateral (pursuant to the Second Lien Credit Facility, as further described below).  As part of the amendment, the First Lien Lenders agreed to subordinate $76,289,062.50 of then-outstanding First Lien Term Loans to the Second Lien Credit Facility in right of payment and security, creating a synthetic third lien credit facility (the "Third Lien Credit Facility") secured by a subordinate and junior priority lien on the Collateral.  As of September 13, 2019, the aggregate principal amount of outstanding First Lien Term Loans that were not subordinated was $25,429,687.50, and the total commitment under the Revolver was $4,950,495.50.

32.     As of the Petition Date, there is approximately $20.4 million of principal outstanding under the First Lien Credit Facility and approximately $81.8 million of principal outstanding under the Third Lien Credit Facility, each including capitalized interest. Approximately $735,031.02 of accrued and unpaid interest is outstanding under the Third Lien Credit Facility.  Both the First Lien Credit Facility and the Third Lien Credit Facility mature on January 31, 2022.

B.      The Second Lien Credit Agreement.

33.     On September 13, 2019, the Company entered into that certain Second Lien Credit Agreement, dated as of September 13, 2019 (as amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among Alex and Ani, LLC, as the borrower, A and A Shareholding Co., LLC, as "Holdings", the Guarantors party thereto from time to time, as guarantors, Wilmington Trust, National Association, as administrative agent, and Lion Capital (as defined in the Second Lien Credit Agreement) and A&A Pledge Co., as initial lenders (the "Second Lien Lenders").  The Second Lien Credit Agreement provides for a $20 million term loan facility (the "Second Lien Credit Facility"), which was secured by a second priority lien on all of the Collateral excluding the Revolver Cash Collateral, which secured only the Revolver under the First and Third Lien Credit Agreement.

34.     Once funded, $5 million of the proceeds from the Second Lien Credit Facility was delivered to Bank of America as cash collateral to secure the Revolver (the "Revolver Cash Collateral") under the First and Third Lien Credit Agreement.  Upon prepayment and termination in full of the Revolver, the First and Third Lien Credit Agreement and the Second Lien Credit Agreement required release of the Revolver Cash Collateral under the First and Third Lien Credit Agreement to prepay outstanding term loans under the Second Lien Credit Facility (the "Prepayment Requirement").  On May 19, 2021, the Revolver was terminated in full by the Borrower and the Revolver Cash Collateral was released to the Borrower's deposit account.  On June 7, 2021, the Company and the requisite amount of First Lien Lenders and Second Lien Lenders amended the First and Third Lien Credit Agreement and the Second Lien Credit Agreement, respectively, to waive and remove the Prepayment Requirement, providing the Company access to the released Revolver Cash Collateral to fund general working capital needs and these cases.

35.     As of the Petition Date, there is approximately $25.2 million of principal outstanding, including capitalized interest, and approximately $219,626.80 of accrued and unpaid interest outstanding under the Second Lien Credit Facility.  The Second Lien Credit Facility matures on January 31, 2022.

C.     **Equity Interests.**

36.     The Company was wholly owned by Ms. Rafaelian until 2012, at which time she sold a 40 percent interest to San Francisco-based private equity firm JH Partners.  JH Partners sold its interest to LC A&A Holdings, Inc., an affiliate of London-based private equity firm Lion Capital LLC (together with its affiliates LC A&A Holdings, Inc. and LC A&A Intermediate Investors LLC, "Lion Capital"), approximately two years later.  LC A&A Holdings, Inc. increased its ownership to approximately 58.75% in connection with the 2019 Restructuring.  As of the Petition Date, the equity units of debtor A and A Shareholding Co., LLC ("A&A Shareholding"), the ultimate parent entity, are held 58.75 percent and 41.25 percent by LC A&A Holdings, Inc. and Ms. Rafaelian (through A&A Pledge Co.), respectively.

D.     **Other Material Pending Litigation.**

37.     The Company has been party to numerous lawsuits stemming from its leadership turnover in the mid-2010s, as further described below.  While the Company was able to resolve the majority of these lawsuits before commencing these chapter 11 cases, a suit by the Company's former acting Chief Operational Officer seeking over $1 million in damages remains outstanding.

III.   **Events Leading to These Chapter 11 Cases.**

38.     The Company experienced two major declines that precipitated these chapter 11 cases.  ***First***, prior to the 2019 Restructuring, the Company's revenue dropped from its peak of approximately $340 million in 2015 to approximately $224 million in 2018 due to operational difficulties.  Moreover, tensions within the Company exacerbated the effects of these challenges

as the Company experienced significant management turnover, which in turn impacted its customer and vendor relationships. The Company attempted to resolve these issues as part of the 2019 Restructuring, as further described below. ***Second***, the COVID-19 pandemic began only six months after the consummation of the 2019 Restructuring, drastically altering consumer habits and creating additional challenges for the already struggling brick and mortar retail stores.

> A.    **Business Challenges and Leadership Turnover.**

39.    Despite the Company's growth between 2010 and 2015, it ran into a series of operational challenges beginning in 2016, including surplus inventory and burdensome long-term leases. The Company also faced challenges with respect to inventory management, which inhibited its ability to fulfill a large percentage of wholesale orders. As a result, the Company's wholesale business declined from 59 percent of total revenue in 2015 to 19 percent of total forecasted revenue for 2021. Additionally, the general shift in consumer preferences away from brick-and-mortar stores led to a decrease in foot traffic and sales in the Company's stores and at authorized retailers.

40.    These operational challenges were compounded by significant overturn in the Company's executive management team. In early 2014, then-CEO Giovanni Feroce departed the Company at Ms. Rafaelian's request. Mr. Feroce's departure was quickly followed by the voluntary or requested departure of the Company's chief financial officer, chief technical officer, chief strategy officer, chief digital officer, acting chief operating officer, assistant general counsel, and its vice presidents of transitional operations, retail, and wholesale.[5] This significant turnover

---

[5]    Certain employee departures resulted in wrongful termination and other employment-related litigation, as described above. As of the Petition Date, the Company is still litigating one employment-related lawsuit stemming from that period, and only recently settled another in April 2021.

in a condensed time period resulted in a significant loss of institutional knowledge and the disruption of key business relationships.

41.     Mr. Feroce was succeeded briefly by Harlan Kent, a former CEO of Yankee Candle.  While Mr. Kent's official title was President, Ms. Rafaelian retained the position of CEO. Mr. Kent's employment with the Company lasted just under a year, at which point in time Ms. Cindy DiPietrantonio, then Chief Operating Officer, was appointed President for a short period. Following Ms. DiPietrantonio's departure, Ms. Rafaelian assumed the responsibilities of President and CEO, a position she maintained until the consummation of the 2019 Restructuring.  During that time, the Company continued to experience operational difficulties.

### B.     The 2019 Restructuring.

42.     In December 2018, Bank of America, then-administrative agent, declared a default under the First Lien Credit Agreement and accelerated the obligations thereunder following a violation of the net leverage ratio covenant.  Bank of America also suspended the Borrower's access to the Revolver, raised the interest rate on the Company's First Lien Term Loans, and imposed certain additional fees.  Additionally, the First Lien Lenders engaged Berkeley Research Group to advise with respect to a restructuring of the Company.  In response to these actions, Ms. Rafaelian authorized the Company to file a lawsuit against Bank of America in July 2019 in the United States District Court for the Southern District of New York (the "BOA Lawsuit") alleging breach of contract, tortious interference, and gender discrimination.

43.     To avoid a bankruptcy proceeding as a result of the acceleration of the Company's outstanding debt obligations, Lion Capital, the then-minority equity owner of A&A Shareholding, engaged with Bank of America and Ms. Rafaelian regarding the terms of a restructuring that would waive the outstanding defaults and provide additional working capital for the Company. Following months of negotiations, the parties agreed to a series of transactions, including:

- the $20 million Second Lien Credit Facility, $13 million of which was provided by Lion Capital and $7 million of which was provided by A&A Pledge Co. (an entity owned by Ms. Rafaelian);

- an amendment of the First Lien Credit Agreement to (a) allow for the incurrence of the Second Lien Credit Facility, (b) subordinate $76,289,062.50 of First Lien Term Loans to the Second Lien Credit Facility, and (c) waive all outstanding defaults;

- dismissal with prejudice of the BOA Lawsuit;

- the resignation of Ms. Rafaelian as Chief Executive Officer and appointment of myself as Chief Restructuring Officer and Interim Chief Executive Officer; and

- adjustment of Ms. Rafaelian's (through A&A Pledge Co.) and Lion Capital's respective equity interest in A&A Shareholding from approximately 60 percent and 40 percent, respectively, to approximately 40 percent and 60 percent, respectively.

44.      On September 13, 2019, Ms. Rafaelian personally borrowed $5 million from Lion Capital pursuant to a promissory note and guaranty of payment (the "Promissory Note") to fund a portion of her commitments under the Second Lien Credit Facility.  The Promissory Note accrued interest at a rate of 3.5 percent payable in cash each calendar month, was secured by a pledge of all of A&A Pledge Co.'s equity in A&A Shareholding, and matured on June 15, 2020. Ms. Rafaelian retained her position as a manager of the board of debtor A and A Shareholding Co., LLC (the "Board") and transitioned to a new role as Chief Creative Officer for the Company.

### C.      The Ryuk Virus and COVID-19 Pandemic.

45.      In February 2020, the Company fell victim to a ransomware virus, known as the Ryuk Virus, which caused significant disruption to the Company's operations for several months. In addition, less than six months after consummating the 2019 Restructuring, the COVID-19 pandemic created unprecedented disruption across many industries and significantly impacted the retail industry as a whole.  The Company was forced to temporarily close all of its stores in March 2020 due to various local, state, and federal stay-at-home orders.  The Company depends heavily on foot traffic in its stores to generate income, with approximately 43 percent of revenue in 2019

derived from its standalone stores. The Company also depends almost entirely on consumer discretionary spending, which declined by over $500 billion in 2020 from the prior year.[6] These factors combined to result in a 40 percent decline in the Company's revenue in 2020.

46. The Company undertook swift cost-cutting measures to adapt to the changing retail environment in response to the government's restrictions on business activities and shutdowns, closing all stores, temporarily furloughing approximately 79 percent of its employees and temporary staff, instituting salary reductions, and terminating over 315 employees, including Ms. Rafaelian on May 8, 2020.

**D.    Carolyn Rafaelian Sues the Company and Lion Capital.**

47. Lion Capital declared a default under the Promissory Note in April 2020 due to Ms. Rafaelian's failure to make monthly interest payments under the Promissory Note. In response, Ms. Rafaelian and several of her affiliated entities sued LC A&A Holdings, Inc., an affiliate of Lion Capital, in the United States District Court for the District of Rhode Island (the "Rhode Island Lawsuit") on June 3, 2020 seeking a declaratory judgment that Ms. Rafaelian was not in breach of the Promissory Note and enjoining the defendant from foreclosing, collecting, or levying on any collateral securing the Promissory Note.

48. On June 12, 2020, Ms. Rafaelian amended her complaint (the "Amended Complaint") to include LC A&A Intermediate Investors, LLC, a Second Lien Lender, equity holder of A&A Shareholding, and another Lion Capital affiliate; debtor A&A Shareholding; myself as Chief Restructuring Officer; and Lyndon Lea, a co-founder of Lion Capital and a manager of the Board, as defendants. The Amended Complaint asserts, among other things,

---

[6]    Thomas Mitterling, Niai Tomass, & Kelsey Wu, *The decline and recovery of consumer spending in the US*, Brookings (Dec. 14, 2020), https://www.brookings.edu/blog/future-development/2020/12/14/the-decline-and-recovery-of-consumer-spending-in-the-us/.

securities fraud and common-law fraud claims against all defendants; breach of contract against A&A Shareholding; and control-person liability against myself and Mr. Lea.  Among other things, Ms. Rafaelian alleges that she was fraudulently induced into participating in the Second Lien Credit Facility based on an alleged misrepresentation of the Company's financial position and its ability to fund certain new product lines.  Ms. Rafaelian is seeking, among other relief, $1 million in alleged damages on her breach of contract claim, rescission of the Second Lien Credit Agreement, and other declaratory and compensatory relief.  The defendants filed a motion to dismiss the Amended Complaint in its entirety, and the Rhode Island Lawsuit remains pending as of the Petition Date.

49.    The Promissory Note matured on June 15, 2020.  Ms. Rafaelian failed to timely make any principal or interest payments as required thereunder.  As a result, Lion Capital filed an action for summary judgment in lieu of complaint against Ms. Rafaelian and certain affiliated guarantors under the Promissory Note on June 17, 2020 in the Supreme Court of the State of New York, New York County (the "New York Supreme Court").  On October 28, 2020, the New York Supreme Court ordered Ms. Rafaelian to repay Lion Capital the $5 million loaned under the Promissory Note in connection with the 2019 Restructuring, as well as interest and attorneys' fees. Ms. Rafaelian ultimately repaid Lion Capital the amounts owed under the Promissory Note and pursuant to the New York Supreme Court's judgment in November 2020.  Ms. Rafaelian filed a notice of appeal  of the New York Supreme Court's order (the "New York Appeal") that same month.  The New York Appeal remains pending as of the Petition Date.

E.    **Current Restructuring Efforts.**

1.    **Continuing Defaults under the First and Third Lien Credit Agreement and Assignment Thereof.**

50.    The Company defaulted under the First and Third Lien Credit Agreement in July 2020 and again in October 2020 as a result of its failure to comply with certain reporting and operational requirements and financial covenants. While the Company originally secured a waiver of these defaults, this prompted ongoing dialogue between the Company and Bank of America, as then-administrative agent, regarding a more comprehensive restructuring. It became clear as part of these conversations that the First Lien Lenders were not interested in supporting a comprehensive restructuring, and no longer intended to support the Company as a going concern.

51.    In February 2021, Bank of America declared another default and accelerated all obligations under the First and Third Lien Credit Agreement following the Company's failure to remit certain amounts and comply with certain reporting requirements and financial covenants thereunder. At this time, the First Lien Lenders insisted on a sale of the Company that would allow for repayment of their outstanding debt. In light of this position, Lion Capital—who was interested in supporting the Company through a restructuring—entered into negotiations with the First Lien Lenders to purchase all outstanding debt under the First Lien Credit Facility and the Third Lien Credit Facility.

52.    On May 26, 2021, the First Lien Lenders sold and assigned all obligations under the First Lien Credit Facility and the Third Lien Credit Facility to Lion Capital and the Borrower permanently terminated the Revolver. Concurrently with the sale and assignment, Wilmington Trust, National Association was appointed as successor agent under the First and Third Lien Credit Agreement.

2.        **Retention of Advisors.**

53.        In April and May 2021, the Company retained Klehr Harrison Harvey Branzburg LLP as co-counsel, Portage Point Partners, LLC ("Portage Point") as investment bankers and restructuring advisors, and Kurtzman Carson Consultants LLC as claims and noticing agent to assist the Company with a review of all strategic alternatives, including a comprehensive balance sheet restructuring and bankruptcy filing.  Kirkland & Ellis LLP was retained in connection with the 2019 Restructuring and continues to act as the Company's legal advisor in connection with the proposed restructuring.

3.        **Governance Initiatives.**

54.        A&A Shareholding formed a restructuring committee (the "Restructuring Committee") in April 2021 comprised of Lawrence Meyer and Scott Burger, the Board's disinterested managers.  Contemporaneously therewith, the Restructuring Committee retained Katten Muchin Rosenman LLP ("Katten") to provide independent legal counsel.  The Restructuring Committee is vested with the authority to, among other things:

- explore such strategic and/or financial alternatives as the Restructuring Committee may determine to be advisable for the Company and its stakeholders;

- monitor and participate in negotiations for a restructuring transaction;

- consider and accept any restructuring transaction that is in the best interests of the Companies and their estates on behalf of the Board;

- negotiate and approve the filing of any pleadings related to the Company's chapter 11 cases, including a plan of reorganization;

- take any and all actions and approve any activities related to a restructuring transaction; and

- conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of the Company, including any claims arising from the 2019 Restructuring (the "Investigation").

55.     In furtherance of the Investigation, the Restructuring Committee has, to date, issued document and information requests to the Company, Ms. Rafaelian, and Lion Capital, reviewed over 3,000 pages of documents, and interviewed four Company employees and one representative of Lion Capital.  The Restructuring Committee's investigation remains ongoing as of the Petition Date.

### 4.     Settlement.

56.     On June 9, 2021, Ms. Rafaelian and certain entities controlled by her (collectively, the "Rafaelian Entities"), the Company, Lion Capital, and the Purchaser entered into a settlement agreement (the "Settlement Agreement"), pursuant to which Lion Capital and the Rafaelian Entities will sell to Purchaser 35 percent of each of the first lien obligations under the First and Third Lien Credit Agreement and the obligations under the Second Lien Credit Agreement, respectively, resolve certain outstanding litigation between the Company, Lion Capital, and the Rafaelian Entities, and provide releases of all other potential claims and causes of action.  As a condition to the Settlement, the Rafaelian Entities and the Purchaser have signed the RSA and agreed to support the restructuring on the terms set forth therein.

57.     The transactions contemplated by the Settlement, including the releases, are conditioned upon approval of the Settlement by the Court.  As a result, the Company expects to file, within 14 days of the Petition Date, a motion seeking approval of the Settlement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure (the "9019 Motion").  Approval of the Settlement and the 9019 Motion will reduce the potential of costly litigation at the outset of these cases.  More specifically, Ms. Rafaelian, through A&A Pledge Co., has asserted that she has certain consent rights under A&A Shareholding's governing documents over certain corporate decisions, including the incurrence of any new indebtedness and any material sales or acquisitions.  In exchange for the releases granted under the Settlement and the consideration received for the

Second Lien Credit Facility claims, however, Ms. Rafaelian has agreed to support the transactions contemplated by the RSA, subject to the terms thereof, thus avoiding any dispute over these consent rights. Thus, the Company believes that approval of the Settlement and 9019 Motion is in the best interests of the Company and all of its stakeholders, and will allow the Company and its advisors to focus on implementing the transactions set forth in the RSA on a fully consensual basis and maximizing the value of the Company through the proposed sale and marketing process without the need for litigation.

**5.     The Restructuring Support Agreement.**

58.     As discussed above, the Company entered into the RSA with 100 percent of its lenders and equity owners on June 9, 2021 (collectively, the "Support Parties"). The RSA provides a commitment from the Support Parties to provide access to cash collateral and backstop a thorough marketing process of the Company's assets through either an equitization or credit bidding of their secured debt claims. The Support Parties' support for the transactions set forth in the RSA is conditioned on, among other things, proceeding efficiently through chapter 11 in accordance with the following timeline:

- entry of an interim order approving the use of Cash Collateral (the "Interim Cash Collateral Order") within five days of the Petition Date;

- contacting potential Sale Transaction counterparties and initiating reciprocal due diligence processes within seven days of the Petition Date;

- occurrence of the Initial Bid Deadline (as defined in the Bidding Procedures Order) within 28 days of the Petition Date;

- the Court holding a hearing regarding entry of orders approving the disclosure statement (the "Disclosure Statement Order"), the procedures governing the Sale Transaction (the "Bidding Procedures Order"), and the use of cash collateral on the a final basis (the "Final Cash Collateral Order") within 40 days of the Petition Date;

- entry of the Disclosure Statement Order, Bidding Procedures Order, and the Final Cash Collateral Order within 42 days of the Petition Date;

- occurrence of the Final Bid Deadline (as defined in the Bidding Procedures Order) within 60 days of the Petition Date;

- holding an auction pursuant to the Bidding Procedures Order within 67 days of the Petition Date;

- the Court holding a hearing regarding entry of an order confirming the plan of reorganization (the "<u>Confirmation Order</u>") or approving the Sale Transaction (the "<u>Sale Order</u>"), as applicable, within 78 days of the Petition Date;

- entry of the Confirmation Order or the Sale Order, as applicable, within 80 days of the Petition Date; and

- occurrence of the plan of reorganization's effective date within 95 days of the Petition Date.

59.     The RSA also conditions the Company's use of cash collateral on the Company providing certain forms of adequate protection, including the grant of adequate protection liens and superpriority claims to all secured lenders and the postpetition accrual of interest on the first lien obligations under the First and Third Lien Credit Agreement.  These protections and the Company's use of cash collateral are an integral component of the RSA and essential to the Company's successful restructuring.  As further discussed in the *Declaration of Ryan Mersch in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, without access to cash collateral, the Company would lack the liquidity to operate and fund these chapter 11 cases, effectively forcing a liquidation of its business.

### 6.     The Marketing and Sale Process

60.     The Company, with the assistance of Portage Point, commenced the marketing and sale process concurrently with the filing of these chapter 11 cases.  The Company and Portage Point anticipate reaching out to approximately 165 prospective interested parties, consisting of both strategic and financial investors, whom they believe may be interested in, and whom the

Debtors reasonably believe would have the financial resources to consummate, a sale. To ensure a thorough and competitive sale process on an appropriate timeline, the Company will continue marketing and soliciting bids postpetition in accordance with the proposed Bidding Procedures contained in the Bidding Procedures Motion. The proposed Bidding Procedures complement the RSA by ensuring that the Company conducts a timely and efficient sale and marketing process, while still creating the opportunity for the Company to solicit the highest value for its stakeholders. The timeline proposed in the proposed Bidding Procedures includes the following milestones:

| Event | Date | Description |
|---|---|---|
| Initial Bid Deadline | July 7, 2021 at 12:00 p.m. (prevailing Eastern Time) | Deadline by which all initial bids must be ***actually received*** by the Company |
| Final Bid Deadline | August 8, 2021 at 12:00 p.m. (prevailing Eastern Time) | Deadline by which all binding bids must be ***actually received*** by the Company |
| Auction (if Necessary) | August 15, 2021 at 10:00 a.m. (prevailing Eastern Time) | The date and time at which the Company will conduct an Auction (as defined in the Bidding Procedures Motion) via remote video |
| Sale Objection Deadline | August 22, 2021 at 4:00 p.m. (prevailing Eastern Time) | Deadline by which objections to the Sale Transaction must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties |
| Sale Hearing | August 26, 2021 or as soon thereafter as the Court's calendar permits | Date for a hearing at which the Court will consider approval of the Sale Transaction |

61.    I believe that the continued marketing process contemplated under the Bidding Procedures will invite the highest possible bids. I understand that the process outlined in the Bidding Procedures is an integral component of the RSA, and as such believe that proceeding on the above timeline is critical to the Company's ability to achieve success in these chapter 11 cases. If the Company is unable to comply with the Milestones, including those specific to the sale and

marketing process, its ability to minimize the impact of these chapter 11 cases on its business will be put at risk.

## IV.   Relief Sought in the First Day Motions.[7]

62.   Contemporaneously herewith, the Company has filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Company's business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Company's balance sheet. The First Day Motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information, and (II) Granting Related Relief*

- *Application of the Debtors for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of Petition Date*

- *Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

- *Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered Into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services,*

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

*(III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief*

- *Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Shippers, Critical Vendors, and 503(b)(9) Claimants and Granting Related Relief*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*

- *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases, (II) Authorizing the Removal or Abandonment of Personal Property Remaining at a Rejected Location, and (III) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Cash Collateral Motion")

- *Debtors' Motion for Entry of (A) An Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Bid Protections, (V) Approving the Contract Assumption and Assignment Procedures, and (B) An Order Authorizing the Debtors to Enter Into A Definitive Purchase Agreement* (the "Bidding Procedures Motion")

63.    The First Day Motions seek authority to, among other things, continue use of cash collateral on an interim basis, honor employee-related wages and benefits obligations, and ensure the continuation of the Company's cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to

giving the Company an opportunity to work towards successful chapter 11 cases—with minimal disruption to the Company's operations—that will benefit all of the Company's stakeholders.

64.    Several of the First Day Motions request authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Company has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Company and its estates.  Other relief will be deferred for consideration at a later hearing.

65.    I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Company to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully implementing the Company's chapter 11 strategy.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 9, 2021

*/s/ Robert Trabucco*
Name:  Robert Trabucco
Title:   Chief Restructuring Officer
           Alex and Ani, LLC

## Exhibit A

**Restructuring Support Agreement**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of June 9, 2021 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):[1]

i.   Alex and Ani, LLC, a company incorporated under the Laws of Rhode Island ("**Alex and Ani**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.  LC A&A Holdings, Inc. and LC A&A Intermediate Investors, LLC, in their capacities as holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, First Lien Credit Facility Claims, Second Lien Credit Facility Claims, Third Lien Credit Facility Claims, and/or Existing Equity Interests in the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Sponsor**");

iii. Carolyn Rafaelian, Alex and Ani Pledge Co., and Venice Beach Walk, LLC in their capacities as holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Second Lien Credit Facility Claims and/or Existing Equity Interests in the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Founder**"); and

iv.  The Bathing Club LLC, as party to the Debt Transfer Settlement (the "**Debt Transfer Purchaser**" and, together with the Consenting Sponsor and the Consenting Founder, collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**A and A LLC Agreement**" means that certain third amended and restated limited liability company agreement of A and A Shareholding Co., LLC, dated as of September 13, 2019, and as may be amended, modified, or supplemented from time to time in accordance with the terms therein.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the First and Third Lien Credit Facility Agreement, the Second Lien Credit Facility Agreement, or the Exit Facility, if applicable, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alex and Ani**" has the meaning set forth in the preamble to this Agreement.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include:  (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Advisors**" means Kirkland & Ellis LLP, Klehr Harrison Harvey Branzburg LLP and Portage Point Partners, LLC.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Credit Facility Claims, the Second Lien Credit Facility Claims, the Third Lien Credit Facility Claims, and Existing Equity Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

3

"**Company Releasing Party**" means each of the Company Parties, and, to the maximum extent permitted by law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Founder**" has the meaning set forth in the recitals to this Agreement.

"**Consenting Sponsor**" has the meaning set forth in the recitals to this Agreement.

["**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) the Consenting Stakeholders; (b) the Agents; and (c) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (b); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (c).] [2]

"**Consenting Stakeholders**" has the meaning set forth in the recitals to this Agreement.

"**Debt Transfer Purchaser**" has the meaning set forth in the recitals to this Agreement.

"**Debt Transfer Settlement**" has the meaning set forth in the Restructuring Term Sheet.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Equity Interests**" has the meaning set forth in the Restructuring Term Sheet.

---

[2]    This definition and related release provisions are under continued negotiations.

"**Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Exit Facility Documents**" means all agreements, documents, and instruments delivered or to be entered into in connection with the Exit Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**First and Third Lien Credit Facility Agreement**" means that certain amended and restated credit agreement, dated as of January 29, 2016 (as amended, restated, or otherwise modified from time to time), by and among Alex and Ani, as borrower, the Debtor guarantors party thereto, Wilmington Trust, National Association, as successor administrative agent, and the other lender, issuer, and agent parties thereto.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Credit Facility**" means the first lien credit facility outstanding under the First and Third Lien Credit Facility Agreement.

"**First Lien Credit Facility Claims**" means any Claim on account of the First Lien Credit Facility.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Incentive Plan**" has the meaning set forth in the Restructuring Term Sheet.

"**Medeiros Litigation**" means the litigation styled *David Medeiros v. Alex & Ani, LLC; A and A Shareholding Company, LLC; Alex and Ani Employee Incentives Holdings, LLC; and Carolyn Rafaelian*, C.A. No. PC-2015-5680 pending in the Superior Court of Rhode Island.

"**Milestones**" has the meaning set forth in the Restructuring Term Sheet.

"**New Organizational Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

5

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in this Agreement and the Restructuring Term Sheet, where applicable.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"**Released Company Parties**" means each of, and in each case in its capacity as such: (a) Company Party; (b) current and former Affiliates of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c). [3]

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 13 of this Agreement.

"**Released Consenting Stakeholder Parties**" means, each of, and in each case in its capacity as such: (a) the Consenting Stakeholders; (b) the Agents; (c) current and former Affiliates of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clause (a) through this clause (d). [4]

"**Released Parties**" means each Released Company party and each Released Consenting Stakeholder Party. [5]

"**Releases**" means the releases contained in Section 13 of this Agreement.

---

[3]    This definition and related release provisions are subject to continued negotiations.

[4]    This definition and related release provisions are subject to continued negotiations.

[5]    This definition and related release provisions are subject to continued negotiations.

"**Releasing Parties**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.[6]

"**Restructuring Expenses**" means the prepetition and postpetition reasonable and documented fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young Conaway Stargatt & Taylor, LLP, as counsel to the Consenting Sponsor.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Order**" has the meaning set forth in the Restructuring Term Sheet.

"**Sale Transaction**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Day Pleadings**" means the pleadings and related documentation requesting certain relief, or supporting the request for such relief, to be heard at the "second day" hearing.

"**Second Lien Credit Facility Agreement**" means that certain amended and restated credit agreement, dated as of September 13, 2019 (as amended, restated, or otherwise modified from time to time), by and among Alex and Ani, as borrower, A and A Shareholding Co., LLC, as holdings, the Debtor guarantors party thereto, Wilmington Trust, National Association as administrative agent, and the other lender, issuer, and agent parties thereto.

"**Second Lien Credit Facility**" means the second lien credit facility outstanding under the Second Lien Credit Facility Agreement.

"**Second Lien Credit Facility Claims**" means any Claim on account of the Second Lien Credit Facility Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Third Lien Credit Facility**" means the third lien credit facility outstanding under the First and Third Lien Credit Facility Agreement.

"**Third Lien Credit Facility Claims**" means any Claim on account of the Third Lien Credit Facility.

---

[6]    This definition and related release provisions are subject to continued negotiations.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Sponsor" refers in this Agreement to each counsel specified in Section 13.10(b).

**Section 2.    *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders;

(b)    the Consenting Stakeholders shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to each of the other Consenting Stakeholders; and

(c)    the Company Parties shall have paid all Restructuring Expenses; provided, that any invoices for the Restructuring Expenses be submitted to the Company Parties at least two Business Days prior to the Agreement Effective Date.

**Section 3.    *Definitive Documents*.**

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (C) the Disclosure Statement; (D) the motion seeking approval of the Disclosure Statement and the other Solicitation Materials; (E) the Solicitation Materials; (F) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (G) the First Day Pleadings and Second Day Pleadings and all orders sought pursuant thereto (excluding any retention applications and corresponding orders); (H) all motions, filings, documents and agreements related to the Sale Transaction, including the Bidding Procedures, the order of the Bankruptcy Court approving the Bidding Procedures, the Sale Order, if any, and any purchase agreement for the Sale Transaction; (I) any interim and final orders approving the consensual use of cash collateral; (J) the New Organizational Documents; (K) the Plan Supplement and all documents, annexes, exhibits, schedules contained therein, including any schedules of rejected contracts; (L) the Exit Facility Documents, if any; (M) [the Management Incentive Plan and any related documents or agreements]; (N) any other material agreements, motions, pleadings, briefs, applications, orders and other filings with the Bankruptcy Court related to the Restructuring Transactions (excluding any retention applications and corresponding orders); and (O) any order, or amendment or modification of any order, entered by the Bankruptcy Court related to the foregoing items (A) through (N).

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Consenting Sponsor; provided, that the Definitive Document set forth in Section 3.01(A) shall be in form and substance acceptable to the Company Parties and the Consenting Sponsor.

**Section 4.**      ***Commitments of the Consenting Stakeholders***.

4.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)      use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b); <u>provided</u>, that nothing in this <u>Section 4.01(a)(iii)</u> shall require the Consenting Sponsor to take any action for which it will incur additional out of pocket or legal expenses unless reimbursed by the Company Parties;

(iv)      give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(v)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)      During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement, directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.  <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.**

5.01.  Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with the Company Parties or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; and (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

5.02.  Entry into this Agreement by the Consenting Founder shall be deemed consent by each Consenting Founder to any and all actions and transactions required to implement the Restructuring Transactions, to the extent such consent is necessary under the A and A LLC Agreement or otherwise.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the implementation or consummation of the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      provide drafts of all Definitive Documents that the Company Parties intend to file with the Bankruptcy Court to counsel to the Consenting Sponsor at least two (2) Business Days, or as soon as practicable under the circumstances, prior to the date when the Company Parties intend to file any such pleading or other document (excluding any retention applications and corresponding orders);

(g)      provide to counsel to the Consenting Sponsor, upon reasonable advance notice to the Company Parties, timely and reasonable responses to all reasonable diligence requests;

(h)      (i) prosecute and defend any objections or appeals relating to the Restructuring Transactions; and (ii) not take any action that is inconsistent with, or alter, delay, impede, or interfere with, the Restructuring Transactions;

(i)      timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (i) directing the appointment of an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee; (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) modifying or terminating the Company's exclusive right to file and solicit acceptances of a plan of reorganization; or (v) for relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(j)      timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Claims of the Consenting Stakeholders;

(k)    comply with all Milestones;

(l)    subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company Parties (other than as consistent with applicable fiduciary duties and as contemplated by this Agreement), keep available the services of its current officers and material employees, subject to voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties, and other than as contemplated by this Agreement, preserve in all material respects its relationships with vendors, customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the Company Parties (other than terminations for cause or consistent with applicable fiduciary duties);

(m)    as soon as reasonably practicable, notify counsel to the Consenting Sponsor of any governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened) that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan of which the Company Advisors have actual knowledge by furnishing written notice to the Consenting Sponsor as soon as practicable after obtaining actual knowledge of such event;

(n)    within two (2) Business Days of obtaining knowledge thereof, provide written notice to counsel to the Consenting Sponsor of any:  (i) occurrence, or failure to occur, of any event of which any of the Company Advisors have actual knowledge which occurrence or failure would cause any covenant of the Company Parties contained in this Agreement not to be satisfied in any respect; (ii) receipt of any written notice by the Company Parties of which the Company Advisors are aware from any governmental body in connection with this Agreement or the Restructuring Transactions; (iii) receipt of any written notice by the Company Parties of which the Company Advisors are aware of any proceeding commenced, or, to the actual knowledge of the Company Advisors, threatened against any Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; and (iv) receipt of any notice from any party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions; and

(o)    shall file a motion to obtain entry of an order extending the automatic stay to all non-Company Party defendants in the Medeiros Litigation.

6.02.  <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)    modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(e)      amend, alter, supplement, restate or otherwise modify any Definitive Document in a manner inconsistent with this Agreement;

(f)      seek, solicit, or support, other than pursuant to the Bidding Procedures, any Alternative Restructuring Proposal, and if the Company Parties receive an unsolicited bona fide expression of interest regarding an Alternative Restructuring Proposal that the boards of directors, members, or managers (as applicable) of the Company Parties, determine in their good-faith judgment provides a higher or better economic recovery to the Company Parties' creditors than that set forth in this Agreement and such Alternative Restructuring Proposal is from a proponent that the boards of directors, members, or managers (as applicable) of the Company Parties have reasonably determined is capable of timely consummating the transactions contemplated by such Alternative Restructuring Proposal, the Company Parties will, within one (1) Business Day of the receipt of such proposal or expression of interest, notify counsel to the Consenting Sponsor of the receipt thereof, with such notice to include the material terms thereof, including the identity of the person or group of persons involved; or

(g)      settle the Medeiros litigation without consulting Consenting Stakeholders regarding the terms thereof.

**Section 7.**      *Additional Provisions Regarding Company Parties' Commitments.*

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.  The Company Parties shall give prompt written notice to the Consenting Sponsor of any determination made in accordance with this Section 7.01.  This Section 7.01 shall not impede any Party's right to terminate this Agreement pursuant to Section 11 of this Agreement.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official

committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; provided, that if any Company Party, receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (x) within one (1) Business Day of receiving such proposal, provide counsel to the Consenting Sponsor with all documentation received in connection with such Alternative Restructuring Proposal; (y) provide counsel to the Consenting Sponsor with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (z) respond promptly to reasonable information requests and questions from counsel to the Consenting Sponsor relating to such Alternative Restructuring Proposal.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.    The Company Parties, to the fullest extent permitted by law, waive the applicability of the automatic stay of section 362 of the Bankruptcy Code to the giving of notice of termination of this Agreement by any Party pursuant to this Agreement; provided, that nothing herein shall prejudice any Party's rights to argue that the giving of such notice of default or termination was not proper under the terms of this Agreement.

**Section 8.** *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or as soon as practicable following the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon

acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.    Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests

**Section 9.**    ***Representations and Warranties of the Consenting Stakeholders***.    Each Consenting Stakeholder represents and warrants that, as of the date such Consenting Stakeholders executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable;

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

16

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)     solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.     *Mutual Representations, Warranties, and Covenants*.**     Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**     *Termination Events*.

11.01.  <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated, with respect to the Consenting Stakeholders, by the Consenting Sponsor by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party set forth in this Agreement that (i) is adverse to the Consenting Stakeholder seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after the Consenting Sponsor transmits a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) Business Days after the Consenting Sponsor transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by the Consenting Sponsor if the Consenting Sponsor sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(d)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the Consenting Sponsor within ten (10) Business Days;

(e)     the Company Parties' consensual use of cash collateral is terminated;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Consenting Sponsor, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing a trustee or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(g)     the Company Parties' failure to meet any of the Milestones unless such Milestone is extended in accordance with this Agreement;

(h)     the Definitive Documents and any amendments, modifications, or supplements thereto include terms that are materially inconsistent with this Agreement and the Restructuring Transactions;

(i)     the Bankruptcy Court enters a final order not subject to appeal granting relief that is inconsistent with, or denies relief sought that is contemplated by, this Agreement or the Plan in any materially adverse respect to the Consenting Stakeholders;

(j)      the Company (i) announces that it will proceed with an Alternative Restructuring Proposal; (ii) files a motion with the Bankruptcy Court seeking the approval of an Alternative Restructuring Proposal or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Restructuring Proposal; (iii) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or announces its intent to pursue an Alternative Restructuring Proposal; or (iv) notifies the Consenting Sponsor of its determination to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law pursuant to Section 7.01 hereof;

(k)      the commencement of an involuntary bankruptcy case against the Company Parties (or affiliate thereof) under the Bankruptcy Code, if such involuntary case is not dismissed within 45 calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case; or

(l)      any representation or warranty in this Agreement made by the Company Parties shall have been untrue in any material respect when made or shall have become untrue in any material respect.

11.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by the Consenting Sponsor of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Sponsor of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan; or

(e)      any representation or warranty in this Agreement made by the Consenting Sponsor shall have been untrue in any material respect when made or shall have become untrue in any material respect.

11.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Consenting Sponsor; and (b) each Company Party.

11.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically (a) without any further required action or notice immediately following the Plan Effective Date and/or (b) upon five (5) business days written notice delivered after the date that is four (4) months after the Petition Date.

11.05.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided</u>, <u>however</u>, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Consenting Sponsor; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.** *Miscellaneous*

13.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

13.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)       if to a Company Party, to:

Alex and Ani, LLC
Attention: Robert Trabucco, Interim Chief Executive Officer and
Chief Restructuring Officer
E-mail address: rtrabucco@alexandani.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg and Allyson Smith
E-mail address:  joshua.sussberg@kirkland.com and
allyson.smith@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Alexandra Schwarzman
E-mail address: alexandra.schwarzman@kirkland.com

(b)    if to the Consenting Sponsor, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 6th Avenue
New York, New York 10019
Attention:  Paul M. Basta, Elizabeth R. McColm and Grace Hotz
E-mail address:  pbasta@paulweiss.com,
emccolm@paulweiss.com and ghotz@paulweiss.com

(c)    if to the Consenting Founder, to:

Kalberer LLP
7 World Trade Center
250 Greenwich Street, 46th Floor
New York, New York 10007
Attention:  Kurt Kalberer
E-mail address:  kkalberer@kalbererlaw.com

(d)    if to the Debt Transfer Purchaser, to:

Geragos & Geragos
644 South Figueroa Street
Los Angeles, California 90017
Attention:  Mark Geragos and Dan Lust
Email address:  mark@geragos.com and lust@geragos.com

23

(e)     if to a Consenting Stakeholder (other than the Consenting Sponsor, the Consenting Founder, or the Debt Transfer Purchaser), to:

To the address set forth on its Joinder or Transfer Agreement, as applicable.

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  Capacities of the Consenting Stakeholders.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.  Survival.  Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13 shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 13 shall survive such termination, and any and all Releases shall remain in full force and effect.

13.20.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Consenting Sponsor, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.  Disclosure.  The Company shall submit drafts to counsel to the Consenting Sponsor of any press releases that constitute disclosures of the existence or terms of this Agreement or any amendment to the terms of this Agreement prior to making any such disclosure.

13.22.  Restructuring Expenses.  The Company Parties shall promptly pay or reimburse the Restructuring Expenses; provided, that to the extent the Company Parties terminate this Agreement under Section 11.02, the Company Parties' reimbursement obligations under this Section 13.22 shall survive with respect to any and all fees and expenses incurred on or prior to the date of termination and such termination shall not automatically terminate any applicable fee or engagement letters.  Concurrently with the Agreement Effective Date, the Company Parties shall pay or reimburse all Restructuring Expenses not previously paid by the Company Parties and shall pay all outstanding Restructuring Expenses at least one (1) day prior to the Petition Date.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ALEX AND ANI, LLC
A AND A SHAREHOLDING CO., LLC
ALEX AND ANI INTERNATIONAL, LLC
ALEX AND ANI RETAIL, LLC
ALEX AND ANI ASSEMBLY, LLC
ALEX AND ANI CALIFORNIA, LLC
ALEX AND ANI CANADA, LLC
ALEX AND ANI PUERTO RICO, LLC
ALEX AND ANI SOUTH SEAS, LLC**

By: _____

Name: Robert Trabucco

Authorized Signatory

[Signature pages on file with Debtors]

## EXHIBIT A

**Company Parties**

Alex and Ani, LLC

A and A Shareholding Co., LLC

Alex and Ani International, LLC

Alex and Ani Retail, LLC

Alex and Ani Assembly, LLC

Alex and Ani California, LLC

Alex and Ani Canada, LLC

Alex and Ani Puerto Rico, LLC

Alex and Ani South Seas, LLC

**EXHIBIT B**

**Restructuring Term Sheet**

*EXECUTION VERSION*

**THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE PLAN EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *RESTRUCTURING TERM SHEET*

### INTRODUCTION

This Restructuring Term Sheet[1] describes the principal terms of the Restructuring and the Restructuring Transactions of Alex and Ani, LLC and its direct and indirect subsidiaries.  The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring are being evaluated, and any such evaluation may affect the terms and structure of any Restructuring.  This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions.  Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring, which remain subject to negotiation and completion in accordance with the Restructuring Support Agreement ("**RSA**") and applicable bankruptcy law.  The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Restructuring Term Sheet or the RSA.  This Restructuring Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Company Parties** | Alex and Ani, LLC; A and A Shareholding Co., LLC; Alex and Ani International, LLC; Alex and Ani Retail, LLC; Alex and Ani Assembly, LLC; Alex and Ani California, LLC; Alex and Ani Canada, LLC; Alex and Ani Puerto Rico, LLC; and Alex and Ani South Seas, LLC. |

---

[1]   Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in **Exhibit 1** to this Restructuring Term Sheet.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Restructuring Summary** | The Restructuring will be consummated through the commencement of the Chapter 11 Cases in the Bankruptcy Court for the District of Delaware to implement the transactions described herein on a prearranged basis. The transactions in this Restructuring Term Sheet may be effectuated pursuant to: |
| | (a)    a sale involving all or substantially all of the Company's restructured equity or assets (the "**Sale Transaction**"); or |
| | (b)    a stand-alone reorganization (the "**Stand-Alone Restructuring**") that is consistent with the provisions set forth in this Restructuring Term Sheet. |
| | The Restructuring shall be effectuated pursuant to a plan of reorganization (the "**Plan**"), which shall provide for the implementation of the Sale Transaction or, alternatively, the Stand-Alone Restructuring, and shall be in form and substance acceptable to the Consenting Sponsor; *provided* that, with the consent of the Consenting Sponsor, the Sale Transaction may alternatively be implemented pursuant to section 363 of the Bankruptcy Code, and the Debtors shall seek approval of any relief required to undertake such 363 sale (the order approving such relief, the "**Sale Order**"). |
| **Overview of Sale Transaction** | Following or contemporaneously with the Petition Date, the Company shall launch a sale process (the "**Sale Process**") to solicit bids for a potential Sale Transaction in accordance with the Milestones, Bidding Procedures, and other terms set forth in the RSA and this Restructuring Term Sheet. |
| | The Company may consummate the Sale Transaction if the Company, with the consent of the Consenting Sponsor, makes a good faith determination that the Sale Transaction is more value-maximizing than a Stand-Alone Restructuring. |
| | The Consenting Sponsor shall have the right to, and may in its discretion, credit bid all or any portion of the First Lien Credit Facility Claims, Second Lien Credit Facility Claims, and Third Lien Credit Facility Claims in connection with the Sale Transaction. |
| | The Sale Transaction and the Plan solicitation process shall generally be conducted in accordance with the procedures and timeline set forth herein and in the Bidding Procedures, attached hereto as **Exhibit 5**. |
| **Overview of Stand-Alone Restructuring** | The Plan shall provide that the Stand-Alone Restructuring may be implemented with the consent of the Consenting Sponsor. |

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Chapter 11 Plan** | On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Debtors, with the consent of the Consenting Sponsor, and the holder of such Allowed Claim or Interest. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter; *provided* that the foregoing shall not apply to the Conditions Precedent to the Plan Effective Date. |
| **Cash Collateral** | The Consenting Sponsor shall consent to the use of Cash Collateral on the terms set forth in the Interim Cash Collateral Order and the Final Cash Collateral Order. The material terms of the use of Cash Collateral are set forth in the proposed Interim Cash Collateral Order attached hereto as **Exhibit 2**. |
| **New Common Equity** | If the Stand-Alone Restructuring is pursued, on the Plan Effective Date, Reorganized Alex and Ani shall issue a single class of common equity interests (the "**New Common Equity**"). The New Common Equity will be distributed in accordance with this Restructuring Term Sheet. |
| **Cash on Hand** | Cash distributions, in accordance with this Restructuring Term Sheet and the Plan, shall be made from cash on hand as of the Plan Effective Date, including proceeds from the Sale Transaction (the "**Sale Proceeds**"), if applicable, and the Exit Facility, if applicable. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the RSA, including but not limited to the consent rights set forth therein. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Tax Matters** | The Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring in a tax efficient and cost-effective manner for the Debtors. |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim shall receive treatment in a manner consistent with section 1129(a)(2) of the Bankruptcy Code. | N/A |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| **Class 1** | **Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Consenting Sponsor: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 2** | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 3** | **Secured Credit Facility Claims** | On the Plan Effective Date, the Secured Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the First Lien Credit Facility, the Second Lien Credit Facility, and the Third Lien Credit Facility, as applicable, including all principal, any accrued and unpaid interest at the contract rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the First Lien Credit Facility, the Second Lien Credit Facility, and the Third Lien Credit Facility, as applicable.<br><br>Except to the extent the holder of an Allowed Secured Credit Facility Claim agrees to less favorable treatment, on the Plan Effective Date, each holder of an Allowed Secured Credit Facility Claim shall receive its pro rata share of:<br><br>(a) **if the Sale Transaction is consummated**, the Sale Proceeds Recovery; or<br><br>(b) **if the Stand-Alone Restructuring is consummated**, [[•] percent of the New Common | Impaired / Entitled to Vote |

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
| | | Equity (subject to dilution by the Management Incentive Plan)]. | |
| **Class 4** | **Go-Forward Vendor Claims** | [•] | Impaired / Entitled to Vote |
| **Class 5** | **General Unsecured Claims** | [•] | Impaired / Entitled to Vote |
| **Class 6** | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim Reinstated or cancelled, released, and extinguished and without any distribution at the Debtors' election. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 7** | **Intercompany Interests** | On the Plan Effective Date, each holder of an Allowed Intercompany Interest shall have its Interest Reinstated or cancelled, released, and extinguished and without any distribution at the Debtors' election. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 8** | **Existing Equity Interests** | On the Plan Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and extinguished without any distribution. | Impaired / Deemed to Reject |

## MILESTONES

The Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (the "**Milestones**"):

(a) No later than June 9, 2021, the Company Parties shall commence the Chapter 11 Cases and shall File the First Day Pleadings, the Plan, the Disclosure Statement, the Disclosure Statement Motion, the Bidding Procedures, and the Bidding Procedures Motion.

(b) No later than 5 days after the Petition Date, the Bankruptcy Court shall have entered the Interim Cash Collateral Order.

(c) No later than 7 days after the Petition Date, the Company and/or its advisors shall have contacted potential interested parties in connection with the Sale Process and initiated the reciprocal due diligence process.

(d) No later than 28 days after the Petition Date, the Initial Bid Deadline pursuant to the Bidding Procedures shall have occurred.

(e) No later than 40 days after the Petition Date, the Bankruptcy Court shall have held a hearing regarding entry of the Disclosure Statement Order, the Bidding Procedures Order, and the Final Cash

| MILESTONES |
|---|
| Collateral Order. |

(f) No later than 42 days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order, the Bidding Procedures Order, and the Final Cash Collateral Order.

(g) No later than 51 days after the Petition Date, the Debtors shall file a notice announcing the appointment of a Stalking Horse Bidder, if applicable and consistent with the Bidding Procedures.

(h) No later than 60 days after the Petition Date, the Final Bid Deadline pursuant to the Bidding Procedures shall have occurred.

(i) No later than 67 days after the Petition Date, the Debtors shall hold an auction pursuant to the Bidding Procedures.

(j) No later than 78 days after the Petition Date, the Bankruptcy Court shall have commenced the Sale Hearing and/or the Confirmation Hearing.

(k) No later than 80 days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order and/or the Confirmation Order.

(l) No later than 95 days after the Petition Date, the Plan Effective Date shall have occurred.

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| **Subordination** | Except as otherwise set forth in this Restructuring Term Sheet and the RSA, the classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Definitive Documents, Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| | before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date. |
| **Releases by the Debtors, Releases by Holders of Claims and Interests, Exculpation, and Injunction** | The Plan shall include the release, exculpation, and injunction provisions set forth in **Exhibit 3** attached hereto. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code to the fullest extent permissible. |
| **Indemnification Obligations** | Unless otherwise determined by the Debtors, consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Parties than the indemnification provisions in place prior to the Restructuring. |
| **Retained Causes of Action** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent to the Plan Effective Date**"): |

(a) the RSA shall remain in full force and effect and shall not have been terminated, no termination event thereunder shall have occurred, and there shall be no default thereunder;

(b) the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the RSA and otherwise in form and substance reasonably acceptable to the Consenting Sponsor, which shall:

(i) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with the RSA and subject to the consent rights set forth therein;

(ii) decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii) authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions; (b) distribute the New Common Equity, if applicable, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Equity, if applicable; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the RSA and subject to the consent rights set forth therein;

(iv) authorize the implementation of the Plan in accordance with its terms; and

(v) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(c) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(d) the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or Filed, as applicable, in form and

## GENERAL PROVISIONS REGARDING THE PLAN

|  | substance consistent in all material respects with the RSA, this Restructuring Term Sheet, and the Plan; |
|  | (e) the Final Order authorizing the use of Cash Collateral shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder; |
|  | (f) to the extent an Exit Facility is entered into, all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Consenting Sponsor and the Company and in effect; |
|  | (g) the Sale Transaction shall have closed, if applicable; |
|  | (h) all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | (i) the payment in cash in full of all Restructuring Expenses; and |
|  | (j) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the RSA (and subject to, and in accordance with, the consent rights set forth therein), this Restructuring Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior written consent of the Consenting Sponsor (not to be withheld unreasonably), may waive any one or more of the Conditions Precedent to the Plan Effective Date without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |

## GENERAL PROVISIONS REGARDING THE SALE TRANSACTION

| **Credit Bid** | The Consenting Sponsor shall have the right to, and may in its discretion, credit bid all or any portion of the First Lien Credit Facility Claims, the Second Lien Credit Facility Claims, and the Third Lien Credit Facility Claims in connection with the Sale Transaction. |

## OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING

| **Restructuring Transaction** | The Confirmation Order and/or the Sale Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Sale Transaction or the Stand-Alone Restructuring. On the Plan Effective Date the Debtors, or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | certificates, and other documents, if any, required to be issued pursuant to the Sale Transaction or the Stand-Alone Restructuring. |
| **Executory Contracts and Unexpired Leases** | On the Petition Date, the Debtors will file a motion seeking to reject the unexpired leases set forth on **Exhibit 4**. |
| | **(a) if the Sale Transaction is consummated**, any executory contracts and unexpired leases ("**Executory Contracts and Unexpired Leases**") to which any of the Debtors are parties shall be deemed rejected as of the date of entry of the Confirmation Order, unless such Executory Contract or Unexpired Lease (i) is assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction, (ii) was previously rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (iii) was previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iv) is the subject of a motion to reject filed by the Debtors on or before the date of entry of the Confirmation Order, or (v) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; or |
| | **(b) if the Stand-Alone Restructuring is consummated**, as of and subject to the occurrence of the Plan Effective Date and the payment of any applicable cure amount, all Executory Contracts and Unexpired Leases shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the date of entry of the Confirmation Order, (iv) contains a change of control or similar provision that would be triggered by the Restructuring (unless such provision has been irrevocably waived), or (v) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts. |
| | In either case, Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims. |
| **[Management Incentive Plan]** | [The New Board shall, following the Plan Effective Date, determine the terms of a new management incentive plan (the "**Management Incentive Plan**").][2] |
| **Governance** | If a Stand-Alone Restructuring Transaction is consummated, the new board of directors of Reorganized Alex and Ani (the "**New Board**") shall be appointed in accordance with the terms of the New Governance Documents, and the identities of the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. |
| | Corporate governance for Reorganized Alex and Ani, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "**New Governance Documents**"), shall be consistent with this Restructuring Term Sheet and section 1123(a)(6) of the Bankruptcy |

---

[2]    This provision is subject to ongoing review and negotiations.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | Code and shall be in form and substance satisfactory to the Consenting Sponsor. |
| **Debt Transfer Settlement** | Within 14 days of the Petition Date, the Debtors shall file a motion seeking approval, pursuant to section 9019 of the Bankruptcy Code, of the settlement agreement between the Company Parties, the Consenting Sponsor, the Consenting Founder, and the Debt Transfer Purchaser, the material terms of which are set forth in the settlement agreement attached hereto as **Exhibit 6**, such that it can be heard at the hearing regarding entry of the Disclosure Statement Order, the Bidding Procedures Order, and the Final Cash Collateral Order. |

**Exhibit 1**

**Definitions**

| Term | Definition |
| --- | --- |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **Affiliate** | As defined in section 101(2) of the Bankruptcy Code. |
| **Agent** | Any administrative agent, collateral agent, or similar Entity under the First Lien Credit Facility, the Third Lien Credit Facility, the Second Lien Credit Facility, or the Exit Facility, if applicable. |
| **Agreement Effective Date** | The date on which the conditions set forth in Section 2 of the RSA have been satisfied or waived by the appropriate Party or Parties in accordance with the RSA. |
| **Alex and Ani** | Alex and Ani, LLC or any successor or assign, by merger, consolidation, or otherwise, prior to the Plan Effective Date. |
| **Allowed** | With respect to any Claim, except as otherwise provided herein: (a) a Claim in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or a different amount; (c) a Claim that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); provided that with respect to a Claim described in clauses (a) through (c) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; provided, further, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall |

| Term | Definition |
|---|---|
| | be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings. |
| **Alternative Restructuring Proposal** | Any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions. |
| **Avoidance Actions** | Any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended. |
| **Bankruptcy Court** | The United States Bankruptcy Court for the District of Delaware. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure. |
| **Bar Date** | The date established by the Bankruptcy Court by which Proof of Claims or Proof of Interests must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proof of Claims or Proof of Interests. |
| **Bidding Procedures** | The procedures governing the sale and marketing process and auction in connection with the Sale Transaction, as set forth in **Exhibit 5** attached hereto. |
| **Bidding Procedures Motion** | The motion seeking approval of the Bidding Procedures. |
| **Bidding Procedures Order** | The order approving the Bidding Procedures and establishing deadlines for the submission of bids and the auction in accordance with such procedures. |
| **Business Day** | Any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York. |
| **Cash Collateral** | As defined in section 363(a) of the Bankruptcy Code. |
| **Cash Collateral Orders** | Collectively, the Interim Cash Collateral Order and Final Cash Collateral Order. |
| **Cause of Action** | Any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, controversies, proceedings, arguments, suits, obligations, |

| Term | Definition |
|------|------------|
|  | liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any Avoidance Actions. |
| **Chapter 11 Cases** | As defined in the RSA. |
| **Claim** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors. |
| **Class** | A category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Company Parties** | As defined in this Restructuring Term Sheet. |
| **Conditions Precedent to the Plan Effective Date** | As defined in this Restructuring Term Sheet. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Date** | The date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021. |
| **Confirmation Hearing** | The hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code. |
| **Consenting Founder** | As defined in the RSA. |
| **Consenting Sponsor** | As defined in the RSA. |
| **Consenting Stakeholders** | As defined in the RSA. |
| **Consummation** | The occurrence of the Plan Effective Date or the closing of the Sale Transaction. |
| **Debt Transfer Purchaser** | As defined in the RSA. |

3

| Term | Definition |
|---|---|
| **Debt Transfer Settlement** | That certain settlement agreement, pursuant to section 9019 of the Bankruptcy Code, between the Company Parties, the Consenting Sponsor, the Consenting Debt and Equityholders, and the Debt Transfer Purchaser, the material terms of which are set forth in the settlement agreement attached hereto as **Exhibit 6**. |
| **Debtor** | Each Company Party that has commenced Chapter 11 Cases. |
| **Definitive Documents** | The documents listed in Section 3 of the RSA. |
| **Disclosure Statement** | The related disclosure statement with respect to the Plan. |
| **Disclosure Statement Motion** | The motion seeking approval of the Disclosure Statement. |
| **Disclosure Statement Order** | The order approving the Disclosure Statement, the Solicitation Materials and solicitation of the Plan. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Estate** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Consenting Stakeholders, (d) the Agents, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |
| **Existing Equity Interest** | An Interest in a Company Party existing as of the Agreement Effective Date. Notwithstanding the foregoing, Existing Equity Interests do not include Intercompany Interests. |
| **Exit Facility** | To the extent necessary (as determined in good faith by the Debtors and the Consenting Sponsor), a new money senior secured credit facility, the net cash proceeds of which shall be used to satisfy Allowed Administrative Claims and for other purposes as determined by the Debtors and the Consenting Sponsor, and shall contain other terms acceptable to the Debtors and the Consenting Sponsor. |
| **File, Filed, or Filing** | File, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. |
| **Final Cash Collateral Order** | The Final Order of the Bankruptcy Court authorizing the use of Cash Collateral on a final basis, the form and substance of which shall be consistent with the proposed order attached hereto as **Exhibit 2** and otherwise reasonably acceptable to the Consenting Sponsor. |

4

| Term | Definition |
|------|-----------|
| **Final Order** | An order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; _provided_ that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order. |
| **First and Third Lien Credit Agreement** | That certain amended and restated credit agreement, dated as of January 29, 2016 (as amended, restated, or otherwise modified from time to time), by and among Alex and Ani, as borrower, the Debtor guarantors party thereto, Wilmington Trust, National Association, as administrative agent, and the other lender, issuer, and agent parties thereto. |
| **First and Third Lien Credit Facility Lenders** | Holders of Allowed First Lien Credit Facility Claims and Allowed Third Lien Credit Facility Claims. |
| **First and Third Lien Credit Facility Loans** | The loans issued under and on the terms set forth under the First Lien Credit Facility and the Third Lien Credit Facility. |
| **First Day Pleadings** | The pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, to be Filed on or around the Petition Date and to be heard at the "first day" hearing. |
| **First Lien Credit Facility** | The first lien credit facility outstanding under the First and Third Lien Credit Agreement. |
| **First Lien Credit Facility Claim** | Any Claim on account of the First Lien Credit Facility. |
| **Founder** | The founder of Alex and Ani, LLC, Carolyn Rafaelian. |
| **General Unsecured Claims** | Any Unsecured Claim against a Debtor. |
| **Governmental Unit** | As defined in section 101(27) of the Bankruptcy Code. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A Claim held by a Debtor against another Debtor. |
| **Intercompany Interest** | An Interest in one Debtor held by another Debtor. |

| Term | Definition |
|------|-----------|
| **Interest** | Any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certified, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordinate pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing. |
| **Interim Cash Collateral Order** | Any order of the Bankruptcy Court authorizing the use of Cash Collateral on an interim basis, the form and substance of which shall be consistent with the proposed order attached hereto as **Exhibit 2**. |
| **Investigation Committee** | The committee of independent director(s) appointed to conduct an independent investigation related to potential claims against insiders of the Company. |
| **Joinder** | A joinder agreement whereby a holder of Claims that is not a Party to the RSA as of the Agreement Effective Date may become a Party to the RSA by executing such joinder agreement. |
| **Law** | Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court). |
| **Lien** | As defined in section 101(37) of the Bankruptcy Code. |
| **[Management Incentive Plan]** | [As defined in this Restructuring Term Sheet.] |
| **Milestones** | As defined in this Restructuring Term Sheet. |
| **New Board** | As defined in this Restructuring Term Sheet. |
| **New Common Equity** | As defined in this Restructuring Term Sheet. |
| **New Organizational Documents** | As defined in this Restructuring Term Sheet. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim that is not a First Lien Credit Facility Claim, a Second Lien Credit Facility Claim, or a Third Lien Credit Facility Claim. |
| **Parties** | As defined in the RSA. |

| Term | Definition |
|---|---|
| **Person** | As defined in section 101(41) of the Bankruptcy Code. |
| **Petition Date** | The date on which the Chapter 11 Cases are commenced. |
| **Plan** | The joint plan of reorganization Filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions. |
| **Plan Effective Date** | The date that is the first Business Day after the Confirmation Date on which all Conditions Precedent to the Plan Effective Date have been satisfied or waived in accordance with the Plan. |
| **Plan Supplement** | Any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be Filed by the Debtors prior to the Confirmation Hearing, and additional documents Filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions and be subject to the consent rights set forth in the RSA and this Restructuring Term Sheet, where applicable. |
| **Priority Tax Claims** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional Claim** | A Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **Proof of Claim** | A proof of claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date as established by the Court. |
| **Proof of Interest** | A proof of Interest Filed against any of the Debtors in the Chapter 11 Cases. |
| **Purchaser** | The purchaser of the Company's restructured equity or assets pursuant to the Sale Transaction. |
| **Reinstatement or Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Released Parties**[1] | [Collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each of the Debtors' current and former directors and officers; (e) each Agent; (f) the Consenting Stakeholders, (g) all holders of Interests; (h) with respect to each of the foregoing (a) through (g), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory |

---

[1]    This definition and related release provisions are subject to continued negotiations.

| Term | Definition |
|---|---|
| | board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.] |
| **Releasing Parties**[2] | [Collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each Agent; (e) the Consenting Stakeholders, (f) all holders of Claims; (g) all holders of Interests; (h) with respect to each of the foregoing (a) through (g), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.] |
| **Reorganized Alex and Ani** | Reorganized Alex and Ani, or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date. |
| **Reorganized Debtors** | A Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date. |
| **Restructuring** | The restructuring of Alex and Ani and its direct and indirect subsidiaries, as described in the RSA and this Restructuring Term Sheet. |
| **Restructuring Expenses** | The prepetition and postpetition reasonable and documented fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young Conaway Stargatt & Taylor, LLP, as counsel to the Consenting Sponsor. |
| **Restructuring Term Sheet** | As defined in the RSA. |
| **Restructuring Transactions** | As defined in the RSA. |
| **RSA** | As defined in the introduction to this Restructuring Term Sheet. |
| **Sale Proceeds Recovery** | For a given Class of Claims, the amount of Sale Proceeds available following satisfaction in full of senior Classes of Claims; *provided* that such amount shall not exceed the amount required for such Class of Claims to be satisfied in full. |

---

[2]    This definition and related release provisions are subject to continued negotiations.

| Term | Definition |
|------|------------|
| **SEC** | The Securities and Exchange Commission. |
| **Second Lien Credit Agreement** | That certain amended and restated credit agreement, dated as of September 13, 2019 (as amended, restated, or otherwise modified from time to time), by and among Alex and Ani, as borrower, A and A Shareholding Co., LLC, as holdings, the Debtor guarantors party thereto, Wilmington Trust, National Association, as administrative agent, and the other lender, issuer, and agent parties thereto. |
| **Second Lien Credit Facility Lenders** | Holders of Allowed Second Lien Credit Facility Claims. |
| **Second Lien Credit Facility Loans** | The loans issued under and on the terms set forth under the Second Lien Credit Facility. |
| **Second Lien Credit Facility** | The credit facility outstanding under the Second Lien Credit Agreement. |
| **Second Lien Credit Facility Claim** | Any Claim on account of the Second Lien Credit Facility. |
| **Secured** | When referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code. |
| **Secured Credit Facility Claim** | Collectively, the First Lien Credit Facility Claims, the Second Lien Credit Facility Claims, and the Third Lien Credit Facility Claims. |
| **Secured Tax Claim** | Any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties. |
| **Securities Act** | The Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law. |
| **Solicitation Materials** | The court-approved Plan and Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan. |
| **Third Lien Credit Facility** | The third lien credit facility outstanding under the First and Third Lien Credit Agreement. |
| **Third Lien Credit Facility Claim** | Any Claim on account of the Third Lien Credit Facility. |
| **Transfer** | To sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions). |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |
| **Unsecured Claim** | Any Claim that is not a Secured Claim. |

**<u>Exhibit 2</u>**

**Proposed Interim Cash Collateral Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ALEX AND ANI, LLC, *et al.*,[1] | ) | Case No. 21-1____ (____) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING
THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion, dated June 9, 2021 (the "Motion")[2] of the above-captioned debtors and

debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases

(collectively, the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 503, and 507 of

title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b),

4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this

interim order (this "Interim Order") and a final order (the "Final Order") inter alia:

(i)        authorizing the Debtors' use of Cash Collateral (as defined below);

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Alex and Ani, LLC (8360); A and A Shareholding, Co., LLC (7939 ); Alex and Ani International, LLC (2247); Alex and Ani Retail, LLC (1227); Alex and Ani Assembly, LLC (3215); Alex and Ani California, LLC (6368); Alex and Ani Canada, LLC (3317); Alex and Ani Puerto Rico, LLC (1477); and Alex and Ani South Seas, LLC (8592).  The Debtors' headquarters and mailing address is:  10 Briggs Drive, East Greenwich, RI 02818.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

(ii)    granting adequate protection to the Prepetition Secured Parties for any Diminution in Value of their respective interests in the Prepetition Collateral (each as defined below), including the Cash Collateral;

(iii)    subject to entry of a Final Order and to the extent set forth herein, waiving the Debtors' right to surcharge the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(iv)    vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order; and

(v)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing.

The Court (as defined below) having considered the Motion, the *Declaration of Ryan Mersch in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, the First Day Declaration, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held pursuant to Bankruptcy Rule 4001(b)(2) on June ___, 2021 (the "Interim Hearing"); and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED BY THE DEBTORS AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.      *Disposition*.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.      *Petition Date*.  On June 9, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Chapter 11 Cases.

C.      *Debtors-in-Possession*.   The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

D.      *Jurisdiction and Venue*.  The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for these Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      *Committee*.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.     _Debtors' Stipulations_.  Subject to Paragraph 11 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations (as defined herein), shall be binding upon the Debtors, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.   The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Challenge Period Termination Date.   Without prejudice to the rights of parties in interest as set forth in Paragraph 11 herein, the Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (Paragraphs F(i) through F(xii) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)     _Prepetition First/Third Lien Credit Facility_.  Pursuant to that certain Credit Agreement, dated as of January 29, 2016 (as amended, restated, supplemented, waived, and/or modified from time to time, the "First/Third Lien Credit Agreement" and, collectively with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, and/or modified from time to time, the "First/Third Lien Documents") by and among Alex and Ani, LLC ("Alex and Ani"), as borrower, A and A Shareholding Co., LLC, as holdings ("Holdings"), the lenders party thereto (respectively, the "First Lien Lenders" and the "Third Lien Lenders" (together, the "First/Third Lien Lenders")), the guarantors (the "Guarantors") party to the relevant First/Third Lien Documents, and Wilmington Trust, National Association, as successor administrative agent (in such capacity, and together with any successor agent, the "First Lien Agent" and the "Third Lien Agent" (together, the "First/Third Lien Agent") and, the First/Third Lien Agent collectively with the First/Third Lien Lenders, the "First/Third Lien Secured Parties"), the First/Third Lien Lenders provided a term loan facility to

4

the Debtors (the "<u>First/Third Lien Facility</u>" or the "<u>Tranche A Term Loans</u>" and the "<u>Tranche B Term Loans</u>," respectively) pursuant to the terms of the First/Third Lien Documents.

(ii)     *Prepetition First/Third Lien Obligations*.  As of the Petition Date, Alex and Ani, Holdings, and the Guarantors (in such capacity, collectively, the "<u>First/Third Lien Obligors</u>") were indebted to the First/Third Lien Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the loans incurred under the First/Third Lien Facility and other obligations incurred thereunder or secured thereby in the aggregate principal amount, including capitalized interest, of $102,229,465.23, consisting of (a) $20,429,687.50 in Tranche A Term Loans (together with all other applicable "Obligations" as defined in the First/Third Lien Credit Agreement, and all interest, fees, costs, and other charges allowable under section 506(b) of the Bankruptcy Code, the "<u>First Lien Obligations</u>") and (b) $81,799,777.73 in Tranche B Term Loans (together with all other applicable "Obligations" as defined in the First/Third Lien Credit Agreement, and all interest, fees, costs, and other charges allowable under section 506(b) of the Bankruptcy Code, and, together with the First Lien Obligations, the "<u>First/Third Lien Obligations</u>").

(iii)     *Prepetition First/Third Liens and Prepetition First/Third Lien Collateral*. As more fully set forth in the First/Third Lien Documents, prior to the Petition Date, the First/Third Lien Obligors granted to the First/Third Lien Agent, for the benefit of itself and the other First/Third Lien Secured Parties, a security interest in and continuing lien on (the "<u>First Liens</u>" and the "<u>Third Liens</u>," as applicable) substantially all of their assets and property (subject to certain exceptions set forth in the First/Third Lien Documents) including a first (subject only to certain liens senior by operation of law or otherwise permitted by the First/Third Lien Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the First Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in

existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "First Lien Permitted Liens")) and third (subject only to certain liens senior by operation of law or otherwise permitted by the First/Third Lien Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Third Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "Third Lien Permitted Liens")), as applicable, priority security interest in and continuing lien on the Collateral (as defined in the First/Third Lien Documents) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "First/Third Lien Collateral").

(iv)    *Validity, Perfection, and Priority of First Liens, Third Liens, and First/Third Lien Obligations*.  As of the Petition Date: (a) the First Liens and Third Liens on the First/Third Lien Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the First/Third Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the First Liens were senior in priority over any and all other liens on the First/Third Lien Collateral, subject to First Lien Permitted Liens; (c) the Third Liens were junior to the First Liens and the Second Liens (as defined below) and were senior in priority over any and all other liens on the First/Third Lien Collateral, subject to Third Lien Permitted Liens; (d) the First/Third Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the First/Third Lien Secured Parties enforceable in accordance with the terms of the applicable First/Third Lien Documents; (e) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the First Liens, Third Liens, or First/Third Lien Obligations exist, and no portion of the First

6

Liens, Third Liens, or First/Third Lien Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, subordination (whether equitable or otherwise), counterclaims, or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law or federal law equivalents or actions for recovery or disgorgement, against any of the First/Third Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon, or related to the First/Third Lien Facility; (g) the Debtors have waived, discharged, and released any right to challenge, and are forever barred from bringing any challenge to, any of the First/Third Lien Obligations, the priority thereof, and the legality, validity, extent, and priority of the First Liens and the Third Liens; and (h) the First/Third Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    *Prepetition Second Lien Credit Facility*.  Pursuant to that certain Second Lien Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented, waived, and/or modified from time to time, the "Second Lien Credit Agreement" and, collectively with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, and/or modified from time to time, the "Second Lien Documents" and, collectively with the First/Third Lien Documents, the "Prepetition Credit Documents") by and among Alex and Ani, as borrower, Holdings, the lenders party thereto (the "Second Lien Lenders" and, together with the First/Third Lien Lenders, the "Prepetition

Lenders"), the Guarantors party to the relevant Second Lien Documents, and Wilmington Trust, National Association, as administrative agent (in such capacity, and together with any successor agent, the "Second Lien Agent" and, collectively with the Second Lien Lenders, the "Second Lien Secured Parties" and, collectively with the First/Third Lien Secured Parties, the "Prepetition Secured Parties" and, the First/Third Lien Agent and the Second Lien Agent shall collectively be referred to herein as the "Prepetition Agents"), the Second Lien Lenders provided a term loan facility to the Debtors (the "Second Lien Facility") pursuant to the terms of the Second Lien Documents.

(vi)    *Prepetition Second Lien Obligations.* As of the Petition Date, Alex and Ani, Holdings, and the Guarantors (in such capacity, collectively, the "Second Lien Obligors") were indebted to the Second Lien Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the loans incurred under the Second Lien Facility and other obligations incurred thereunder or secured thereby in the aggregate principal amount, including capitalized interest, of $25,201,063.59 (together with all other "Obligations" as defined in the Second Lien Credit Agreement, and all interest, fees, costs, and other charges allowable under section 506(b) of the Bankruptcy Code, the "Second Lien Obligations" and, collectively with the First/Third Lien Obligations, the "Prepetition Obligations").

(vii)    *Prepetition Second Liens and Prepetition Second Lien Collateral.* As more fully set forth in the Second Lien Documents, prior to the Petition Date, the Second Lien Obligors granted to the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, a security interest in and continuing lien on (the "Second Liens" and, collectively with the First Liens and the Third Liens, the "Prepetition Liens") substantially all of their assets and property (subject to certain exceptions set forth in the Second Lien Documents) including a second priority (subject

only to certain liens senior by operation of law or otherwise permitted by the Second Lien Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the First Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "Second Lien Permitted Liens")) security interest in and continuing lien on the Collateral (as defined in the Second Lien Documents) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Second Lien Collateral" and, together with the First/Third Lien Collateral, the "Prepetition Collateral").

(viii)    *Validity, Perfection, and Priority of Second Liens and Second Lien Secured Obligations*.  As of the Petition Date: (a) the Second Liens on the Second Lien Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Second Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the Second Liens were junior in priority to the First Liens and were senior in priority over any and all other liens on the Second Lien Collateral, subject only to Second Lien Permitted Liens; (c) the Second Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Second Lien Secured Parties enforceable in accordance with the terms of the applicable Second Lien Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Second Liens or Second Lien Obligations exist, and no portion of the Second Liens or Second Lien Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, subordination (whether equitable or otherwise), counterclaims, or cross-claims pursuant to the Bankruptcy Code or

applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law or federal law equivalents or actions for recovery or disgorgement, against any of the Second Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon, or related to the Second Lien Facility; (f) the Debtors have waived, discharged, and released any right to challenge, and are forever barred from bringing any challenge to, any of the Second Lien Obligations, the priority thereof, and the legality, validity, extent, and priority of the Second Liens; and (g) the Second Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)    *Cash Collateral*.  All or substantially all of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes cash collateral ("<u>Cash Collateral</u>") of the Prepetition Secured Parties.

(x)    *Intercreditor Agreement*.  The Prepetition Agents are parties to the Intercreditor and Subordination Agreement, dated as of September 13, 2019 (as amended, restated, supplemented, waived, and/or modified from time to time, the "<u>Intercreditor Agreement</u>"), which governs, among other things, the respective rights, interests, obligations, priority, and positions of the Bank Group Secured Parties and the Subordinated Facility Secured Parties (each as defined in the Intercreditor Agreement) with respect to the assets and properties of the Debtors and other obligors.  Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Credit

Documents shall (a) remain in full force and effect, (b) continue to govern the relative obligations, priorities, rights, and remedies of the Bank Group Secured Parties and the Subordinated Facility Secured Parties (each as defined in the Intercreditor Agreement), and (c) not be deemed to be amended, altered, or modified by the terms of this Interim Order.

(xi)    *Credit Bids*.    Subject to the Prepetition Credit Documents, the Debtors admit, stipulate, acknowledge, and agree that, subject to entry of a Final Order, the applicable Prepetition Agents (at the direction of the applicable Prepetition Lenders) shall have the rights granted pursuant to and consistent with section 363(k) of the Bankruptcy Code with respect to any credit bidding of the Prepetition Obligations.

(xii)    *Releases*.    Subject to Paragraph 11 hereof and the occurrence of the Challenge Period Termination Date (as defined herein), the Debtors, on behalf of themselves and their respective estates (including any successor, trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their estates) hereby forever, unconditionally and irrevocably release, discharge, and acquit each of the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, agents, and professionals, past, present, and future, and their respective heirs, predecessors, successors, and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Prepetition Credit Documents and/or the transactions contemplated thereunder including, without limitation, (a) any so-called "lender

liability" or equitable subordination claims or defenses, (b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all claims and causes of action with respect to the extent, validity, priority, perfection, or avoidability of the Prepetition Liens and the Prepetition Obligations.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations that the Debtors now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court entering this Interim Order.

G.    _Adequate Protection_.  To protect their interests in the Prepetition Collateral, the Prepetition Secured Parties are entitled to receive adequate protection for any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date resulting from, among other things, the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral, or the imposition of the automatic stay (collectively, the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  Pursuant to sections 361, 363, 503(b), and 507(b) of the Bankruptcy Code, as adequate protection, (i) each of the Prepetition Agents, for the benefit of itself and the applicable Prepetition Lenders, shall receive the Adequate Protection Liens (as defined below) and the 507(b) Claims and (ii) the First Lien Agent, for the benefit of itself and the First Lien Lenders, shall receive the Adequate Protection Payments (as defined below).  The adequate protection provided herein and other benefits and privileges contained herein are necessary to protect the Prepetition Secured Parties from any Diminution in Value of their interests in the Prepetition Collateral and to obtain the consents and agreements contained herein, including that the adequate protection provided herein is subject and subordinate solely to the Carve Out (as defined below).  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the

Prepetition Collateral (including the Cash Collateral) were negotiated in good faith, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral. The Prepetition Secured Parties reserve the right to seek additional adequate protection beyond the adequate protection provided in this Interim Order. Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Released Parties of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

H.      *Sections 506(c), 552(b), and Marshaling*.  In light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled (subject to entry of a Final Order) to the rights and benefits of section 552(b) of the Bankruptcy Code and a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral, and the Debtors intend to seek in the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and  a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.      *Consent by Prepetition Secured Parties*.  The applicable Prepetition Agents (at the direction of the applicable Prepetition Lenders under the Prepetition Credit Documents) have agreed not to object to, conditioned on the entry of this Interim Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order, and the terms of the adequate protection provided for in this Interim Order.

J.      *Necessity of Relief Requested*.  The ability of the Debtors to finance their operations and complete a successful chapter 11 reorganization requires continued use of Cash Collateral.  In

the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and immediate and irreparable harm to the Debtors, their estates, and their creditors would occur.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business or to maintain their property without the use of Cash Collateral.  The relief requested in the Motion is therefore necessary for the continued operation of the Debtors' businesses and the preservation of their property.  The Prepetition Lenders and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (as defined below).  Entry of this Interim Order is in the best interests of the Debtors and their estates, and is necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors and the Debtors' estates, stakeholders, assets, goodwill, reputation and employees.

K.     _Good Cause Shown; Best Interest_.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2.  Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

L.     _Final Hearing_.  The Debtors will seek final approval of the relief requested in the Motion pursuant to a Final Order at the Final Hearing, notice of which will be provided in accordance with Paragraph 22 of this Interim Order.

M.     _Notice_.  In accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including:  (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Agents or, in lieu thereof, counsel thereto; (d) the Consenting Sponsor (as defined below) or, in lieu thereof, counsel thereto; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Environmental Protection Agency; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the Securities and Exchange Commission; (j) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The parties have made reasonable efforts to afford the best notice possible under the circumstances to permit the relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     Motion Granted.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.     Objections Overruled.  All objections to the Motion to the extent not withdrawn or resolved are overruled.  This Interim Order shall become effective immediately upon its entry.

3.     <u>Authorization to Use Cash Collateral</u>.

(a)     <u>Specified Period</u>.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized to use Cash Collateral in accordance with the Budget (as defined below) for the period (the "<u>Specified Period</u>") from the Petition Date through the date which is the earliest to occur of (i) the expiration of the Default Notice Period (as defined herein), (ii) the date that is 42 days from the Petition Date if the Court has not entered the Final Order on or before such date, and (iii) the date that is 4 months after the Petition Date, in each case subject to extension with the consent of the Required First Lien Lenders.[4]

(b)     <u>Use of Cash Collateral</u>.  Subject to the provisions of this Interim Order, including the Budget, Cash Collateral may be used during the Specified Period by the Debtors to: (i) finance their working capital needs and for any other general corporate purposes; (ii) pay related transaction costs, fees, liabilities, and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of these Chapter 11 Cases (including the Adequate Protection Payments); and (iii) pay any prepetition obligations authorized to be paid pursuant to any "First Day Order" entered by the Court, in each case solely to the extent consistent with the Budget and this Interim Order.

4.     <u>Adequate Protection</u>.  The Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) (such adequate protection as set forth in clauses (a)-(g) below, the "<u>Adequate Protection Obligations</u>").  Each Prepetition Agent, on behalf of itself

---

[4]    "<u>Required First Lien Lenders</u>" means, at any time, First Lien Lenders holding more than 50% of the Outstanding Amount (as defined in the First/Third Lien Credit Agreement) of the Tranche A Term Loans.

and for the benefit of the applicable Prepetition Lenders, is hereby granted, as applicable, the following:

(a)    Adequate Protection Liens.  As adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant, and as of entry of this Interim Order are deemed to have granted, to each Prepetition Agent, for the benefit of itself and the applicable Prepetition Lenders, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (the "Adequate Protection Liens") all of each Debtor's presently owned or hereafter acquired property and assets (including, subject to entry of a final order, any proceeds of, or property recovered in connection with, any of the Debtors' claims or causes of action under sections 542, 544, 545, 547, 548, or 550 of the Bankruptcy Code or any other similar state or federal law), whether such property and assets were acquired by such Debtor before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, including, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and any investment thereof, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors, and the proceeds and products of the foregoing (collectively, together with the Prepetition Collateral and the Cash Collateral, the "Collateral").  For the avoidance of doubt, the Adequate Protection Liens shall encumber any deposits provided by bidders on some or all of the Debtors' assets to the extent such deposits are forfeited or retained by any of the Debtors.  The Adequate

17

Protection Liens shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in these Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases").  Except as expressly provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of these Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of these Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code and, if approved in the Final Order, the Adequate Protection Liens shall not be subject to section 506(c) of the Bankruptcy Code.   The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases.  For the avoidance of doubt, the Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Petition Date and without the necessity of the execution by the Debtors, or the filing of, as applicable, mortgages, security agreements, pledge agreements, financing statements, state or federal notices, recordings (including, without limitation, any recordings with the United States Patent and Trademark or Copyright Office), or other agreements and without the necessity of taking possession or control of any Collateral.  Except as otherwise expressly provided herein (including with respect to the Carve Out), under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising.

(i)      The Adequate Protection Liens granted to the First Lien Agent for the benefit of the First Lien Lenders (the "First Lien AP Liens") shall be subject and subordinate only to (A) the Carve Out and (B) any validly perfected, enforceable, and unavoidable First Lien Permitted Liens in existence as of the Petition Date, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(ii)      The Adequate Protection Liens granted to the Second Lien Agent for the benefit of the Second Lien Lenders (the "Second Lien AP Liens") shall be subject and subordinate only to (A) the Carve Out, (B) the First Lien AP Liens, (C) the First Liens, and (D) any validly perfected, enforceable, and unavoidable Second Lien Permitted Liens in existence as of the Petition Date, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(iii)      The Adequate Protection Liens granted to the Third Lien Agent for the benefit of the Third Lien Lenders shall be subject and subordinate only to (A) the Carve Out, (B) the First Lien AP Liens, (C) the First Liens, (D) the Second Lien AP Liens, (E) the Second Liens, and (F) any validly perfected, enforceable, and unavoidable Third Lien Permitted Liens in existence as of the Petition Date, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(b)      Adequate Protection Superpriority Claims.  To the extent of any Diminution in Value of the interests of the Prepetition Secured Parties in the Prepetition Collateral, each Prepetition Agent, on behalf of itself and the applicable Prepetition Lenders, shall be granted an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "507(b) Claims"), which 507(b) Claims shall have recourse to and be

payable from all prepetition and postpetition property of the Debtors and the proceeds thereof, excluding the Carve Out.

(i)        Subject only to the Carve Out, the 507(b) Claims granted to the First Lien Agent for the benefit of the First Lien Lenders (the "First Lien 507(b) Claims") shall not be junior to any administrative expense claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(ii)        Subject only to the Carve Out and the First Lien 507(b) Claims, the 507(b) Claims granted to the Second Lien Agent for the benefit of the Second Lien Lenders (the "Second Lien 507(b) Claims") shall not be junior to any administrative expense claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(iii)        Subject only to the Carve Out, the First Lien 507(b) Claims, and the Second Lien 507(b) Claims, the 507(b) Claims granted to the Third Lien Agent for the benefit of the Third Lien Lenders shall not be junior to any administrative expense claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or

hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(c)    Fees and Expenses.  The Debtors are authorized and directed to pay, within ten (10) calendar days of delivery of an invoice (which shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines), all reasonable and documented prepetition and postpetition fees and expenses of:  (i) the Prepetition Agents, including the reasonable and documented prepetition and postpetition fees of Alston & Bird LLP and one local counsel, if any, retained by the Prepetition Agents, in their capacities as such; and (ii) counsel and other advisors and professionals to Lion Capital (Americas), Inc. (the "Consenting Sponsor"), in its capacity as a Prepetition Lender, including the reasonable and documented prepetition and postpetition fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Sponsor, and Young Conaway Stargatt & Taylor, LLP, as local counsel to the Consenting Sponsor.  Payment of all such fees and expenses shall not be subject to allowance by the Court; provided, however, that counsel to the Consenting Sponsor and the Prepetition Agents shall promptly provide copies of invoices received on account of the fees and expenses set forth above to the U.S. Trustee, counsel to any Committee appointed in the Chapter 11 Cases, and counsel to the Debtors, and the Court shall have exclusive jurisdiction over any objections raised by the Debtors, the Committee (if appointed) or the U.S. Trustee to the invoiced amount of the fees and expenses proposed to be paid, which

objections may only be raised within ten (10) calendar days after delivery of an invoice(s) therefor and shall be limited to the issue of the reasonableness of such fees and expenses.  In the event that within ten (10) calendar days from delivery of such invoices the Debtors, the U.S. Trustee or counsel to the Committee (if appointed) raises an objection to a particular invoice, and the parties are unable to resolve such objection, the Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court.

(d)     Adequate Protection Payments.  All obligations, including accrued but unpaid interest, under the First/Third Lien Documents owing to the Prepetition Secured Parties in respect of the First Lien Obligations by the Debtors thereunder and other fees owing by the Debtors thereunder shall continue to accrue interest (and interest on interest) at the default rate applicable on the Petition Date under the First/Third Lien Credit Agreement (the "Adequate Protection Payments") and shall be payable in kind.

(e)     Budget and Variance Reporting.    Attached as Exhibit A hereto and incorporated herein by reference is a 13-week cash flow forecast (the "Budget"), including the anticipated uses of the Cash Collateral for such period.  Every four (4) weeks following entry of the Interim Order, on the last business day of such week, the Debtors will provide counsel to the Prepetition Agents and counsel to the Consenting Sponsor with an updated Budget for the subsequent 13-week period.  The initial Budget and each subsequent Budget shall be in form and substance acceptable to the Required First Lien Lenders and each such subsequent Budget shall not be deemed to constitute the "Budget" for purposes of this Interim Order until such consent has been confirmed in writing by counsel to the Required First Lien Lenders.  Each week following

entry of the Interim Order, on the third business day of such week, the Debtors shall also provide to the Prepetition Agents and counsel to the Consenting Sponsor a Budget variance report/reconciliation (the "Budget Variance Report") setting forth in reasonable detail actual cash receipts and disbursements for the prior week, and, beginning after the first four (4)-week period, all variances, on an individual line-item basis and an aggregate basis, as compared to the previously delivered Budget on a cumulative weekly basis over a rolling four (4)-week period, together with a statement certifying compliance with the Budget Covenants (as defined below) set forth below. The Budget Variance Report shall include an explanation, in reasonable detail, of any material variance.   The Debtors shall ensure that at no time any of the following occur (together, the "Budget Covenants"):  (i) a negative variance of 15.0% or more from the total cash receipts set forth in the Budget, to be tested on a cumulative basis over a rolling four (4) week period; and (ii) a negative variance of 15.0% or more from the "Total Disbursements," tested every week on a cumulative rolling four (4)-week basis; provided, that in any rolling four (4)-week period that "Total Disbursements" are less, and/or total cash receipts are more, than the budgeted amount for such period, the amount by which "Total Disbursements" are less and/or total cash receipts are more may be carried forward and added to the subsequent period; provided further, that "Total Disbursements" shall include disbursements made by the Debtors (including, but not limited to, any payments, expenditures, or advances) other than (i) Adequate Protection Payments and (ii) professional fees and expenses related to administration of these Chapter 11 Cases.

(f)      Access to Records.   Upon two (2) business days' written notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, counsel, and employees of the Prepetition Agents and the Consenting Sponsor to have reasonable access to (i) inspect the Debtors' properties, (ii) examine the Debtors' books and records, and (iii)

23

to discuss the Debtors' affairs, finances, and condition with the Debtors' senior management and financial advisors, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and financial advisors (during normal business hours), and the Prepetition Agents and the Consenting Sponsor (including their respective counsel) shall be provided with reasonable access to the information they shall reasonably request.

(g)    <u>Right to Seek Additional Adequate Protection</u>.    This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

5.    <u>Modification of Automatic Stay</u>.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the Adequate Protection Liens and the 507(b) Claims; (b) permit the Debtors to perform such acts as the Prepetition Agents or Prepetition Lenders may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

6.    <u>Grant and Perfection of Adequate Protection Liens</u>.    This Interim Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, enforceability, and priority of the Adequate Protection Liens without the necessity of obtaining, filing, executing, or recording any financing statement, security agreement, vehicle lien application, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice, or other instrument or document

that may otherwise be required under the law or regulation of any jurisdiction or the taking of possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement and any other action required to obtain "control" pursuant to section 9-104, 9-105, 9-106, and/or 9-107 of the Uniform Commercial Code) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the Prepetition Agents are authorized, but not required, to file, as it deems necessary or advisable in its sole discretion, such financing statements, security agreements, vehicle lien applications, patent filings, trademark filings, copyright filings, fixture filing, mortgages, notices of liens, and other instruments or similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, security agreements, vehicle lien applications, patent filings, trademark filings, copyright filings, fixture filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, evidence, or perfect the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Agents all such financing statements, security agreements, vehicle lien applications, mortgages, notices, instruments, and other documents as the Prepetition Agents may reasonably request.  The Prepetition Agents may file a copy of this Interim Order as a financing statement or notice with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, mortgages, notices of lien, instrument, or similar document.  In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized to do and perform all acts to make,

execute, and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for the Debtors' performance hereunder.

7.  <u>Credit Bid</u>.  Subject to entry of a Final Order and Paragraph 11 hereof, the applicable Prepetition Agents shall have the right to credit bid (at the direction of the applicable Prepetition Lenders) under section 363(k) of the Bankruptcy Code all or any portion of their respective Prepetition Obligations, including any accrued and unpaid interest, expenses, and fees, in connection with a sale of any Prepetition Collateral or Collateral, without the need for further order of the Court, and whether such sale is effectuated under section 363 of the Bankruptcy Code, under a chapter 11 plan of reorganization for any or all of the Debtors, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to priorities set forth herein and the terms of the Prepetition Credit Documents.

8.  <u>Events of Default</u>.  The occurrence and continuance of any of the following events, unless waived in writing by the Required First Lien Lenders, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):

(a)    the failure to obtain a Final Order in form and substance acceptable to the Required First Lien Lenders within 42 days after the Petition Date;

(b)    the Debtors shall have (i) filed a motion seeking to create, or (ii) created, incurred, or suffered to exist, any postpetition liens or security interests, other than those granted or permitted pursuant to this Interim Order without the consent of the Required First Lien Lenders;

(c)    the Debtors shall have filed a disclosure statement or chapter 11 plan that is not reasonably acceptable to the Required First Lien Lenders;

(d)      any of the documents or other information required to be delivered to any of the Prepetition Secured Parties pursuant to the Interim Order shall contain any material misrepresentation;

(e)      the entry of an order by the Court, other than this Interim Order or the Final Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority;

(f)      the Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise with respect to any Collateral;

(g)      the Debtors shall support, commence, or join as an adverse party in any suit or other proceeding against the Prepetition Agents or the Prepetition Lenders relating to the Prepetition Obligations or Collateral, including any proceeding seeking to avoid or require repayment of any Adequate Protection Payments;

(h)      reversal, amendment, supplement, vacatur, or modification (without the express prior written consent of the Required First Lien Lenders) of this Interim Order;

(i)      the entry of an order by the Court avoiding or requiring repayment of any portion of the Adequate Protection Payments made by the Debtors hereunder;

(j)      the Interim Order or any other document filed in the Chapter 11 Cases by the Debtors provides for the nonconsensual priming of the Prepetition Liens;

(k)      the Debtors shall create, incur, or suffer to exist any other claim which is *pari passu* with or senior to the 507(b) Claims;

(l)    dismissal of any of these Chapter 11 Cases or conversion of any of these Chapter 11 Cases to chapter 7 cases, or appointment of a trustee, receiver, interim receiver, or manager, or appointment of a responsible officer or examiner with enlarged powers in any of these Chapter 11 Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(m)    the cessation of all or any material part of the Debtors' business operations, considered on a consolidated basis, without the consent of the Required First Lien Lenders;

(n)    the Debtors' exclusive right to file and solicit acceptances of a plan of reorganization is terminated or terminates;

(o)    termination of the Restructuring Support Agreement other than a termination by the Debtors pursuant to Section 11.02(a) of the Restructuring Support Agreement;

(p)    the failure to make Adequate Protection Payments or other payments to the Prepetition Secured Parties as set forth herein when due and such failure shall remain unremedied for more than five (5) business days after receipt by the Debtors of written notice thereof from the First Lien Agent; and

(q)    the failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, or obligations under this Interim Order, including a breach of the Budget Covenants set forth in Paragraph 4(e) hereof.

9.    <u>Rights and Remedies Upon Event of Default</u>.  Upon occurrence of and during the continuance of an Event of Default, the Prepetition Secured Parties may, subject to the Intercreditor Agreement, deliver to the Debtors, the U.S. Trustee, and counsel to the Committee (if any) a written notice declaring such Event of Default (any such notice, a "<u>Default Declaration</u>"). Following the delivery of the Default Declaration to the Debtors, the U.S. Trustee, and counsel to

the Committee (if any), the Prepetition Secured Parties may, subject to the Intercreditor Agreement, file an emergency notice on five (5) business days' notice (the "Default Notice Period") seeking to obtain the Court's determination that (a) an Event of Default has occurred and (b) the Prepetition Secured Parties may, subject to the Intercreditor Agreement, exercise the remedies available to them under this Interim Order and applicable non-bankruptcy law, including, but not limited to, revoking the Debtors' right to use Cash Collateral and collecting and applying any proceeds of the Collateral in accordance with the terms of this Interim Order and the Prepetition Credit Documents.  During the Default Notice Period, the Debtors may continue to use Cash Collateral in accordance with the terms of this Interim Order solely to pay necessary expenses set forth in the Budget to avoid immediate and irreparable harm to the Debtors' estates.  Unless the Court orders otherwise during the Default Notice Period, at the end of the Default Notice Period, the Debtors shall automatically, without further notice or order of the Court, no longer have the right to use or seek to use Cash Collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the Default Notice Period, without further notice or order of the Court, and the Prepetition Secured Parties shall, subject to the Intercreditor Agreement, be permitted to exercise all rights and remedies set forth in this Interim Order, the Prepetition Credit Documents, and as otherwise available at law without further order, application, or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.  The delay or failure to exercise rights and remedies under this Interim Order or the Prepetition Credit Documents shall not constitute a waiver of the Prepetition Secured Parties' rights thereunder or otherwise.

10.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (and, in the case of the Committee Professionals (as defined below), subject to the Budget and the Committee Investigation Budget), all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and (subject to the Budget and the Committee Investigation Budget) the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the First Lien Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $650,000 incurred after the first business day following delivery by the First Lien Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice stating that the Post-Carve Out Trigger Notice Cap has been invoked delivered by email (or other electronic means) by the First Lien Agent at the direction of the Required First Lien Lenders to the Debtors,

their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default and upon termination of the Debtors' right to use Cash Collateral by the Prepetition Secured Parties pursuant to written notice delivered by email (or other electronic means) by the First Lien Agent at the direction of the Required First Lien Lenders to the Debtors.

(b)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the First Lien Agent to the Debtors with a copy to counsel to the Committee (if appointed) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Agents for the benefit of the Prepetition Secured Parties, unless the Prepetition Obligations have been indefeasibly paid in full,

in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Agents for the benefit of the Prepetition Secured Parties, unless the Prepetition Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the Prepetition Credit Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 10(b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 10(b), prior to making any payments to the Prepetition Agents or any of the Debtors' creditors, as applicable. Notwithstanding anything to the contrary in the Prepetition Credit Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Prepetition Agents for application in accordance with the Prepetition Credit Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Obligations (as defined in the First/Third Lien Credit Agreement or the Second Lien Credit Agreement, as applicable) or increase or reduce the Prepetition Obligations, (ii) the failure of the

Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or in any Prepetition Credit Documents, the Carve Out shall be senior to all liens and claims securing the Prepetition Collateral, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the Prepetition Obligations.

(c)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees incurred prior to the first business day following the Termination Declaration Date shall not reduce the Post-Carve Out Trigger Notice Cap.

(d)    No Direct Obligation To Pay Allowed Professional Fees.  None of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees incurred on or after the first business day following

the Termination Declaration Date shall permanently reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis.

11.      Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims.  The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors and their affiliates in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Challenge Period Termination Date.  The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon all other parties-in-interest, including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for a Debtor or the Committee (if appointed) and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party-in-interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has filed an adversary proceeding (i) on or before the date that is sixty (60) calendar days after the Petition Date, subject to further extension by written agreement of the Debtors and the Required First Lien Lenders each acting in their sole discretion (in each case, a "Challenge Period" and the date of expiration of each Challenge Period being a "Challenge Period Termination Date"), (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any Prepetition Secured Party; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"), and (iii) there is a final order entered in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any

such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including, without limitation, the Committee (if appointed), any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases.   If any such adversary proceeding is timely filed, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Obligations,

and an order of the Court conferring such standing on a Committee (if appointed) or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee (if appointed) or such other party-in-interest.

12.    <u>Limitations on the Use of Cash Collateral</u>.  Notwithstanding anything herein to the contrary, the Debtors shall not assert or prosecute, and no portion of the Collateral or the proceeds of the Collateral, including any Cash Collateral or the Carve Out, and no disbursements set forth in the Budget, shall be used in connection with (a) preventing, hindering, or delaying the Prepetition Secured Parties' enforcement or realization upon any of the Collateral once an Event of Default has occurred and after the Default Notice Period, (b) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations or Collateral, or any other rights or interest of the Prepetition Secured Parties, (c) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or (d) paying any amount on account of any claims arising prior to the Petition Date or any non-ordinary course administrative claim unless such payments are (i) approved by an order of this Court and (ii) in accordance with the Budget Covenants; <u>provided</u>, <u>however</u>, that up to $50,000 of Cash Collateral may be used to pay the allowed fees and expenses incurred solely by the Committee (if appointed) in investigating (but not commencing or prosecuting), the validity, enforceability, perfection, priority, or extent of the liens under the Prepetition Credit Documents (the "<u>Committee Investigation Budget</u>").

13.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

14.    <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time, or any future proceeding that may result therefrom, including any Successor Cases, shall be charged against or recovered from the Prepetition Secured Parties or any of their respective claims or the Collateral (including the Prepetition Collateral) pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the First Lien Agent or the Required First Lien Lenders, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such representatives, agents, or lenders. Upon entry of the Final Order, the Debtors and their estates shall be deemed to have irrevocably waived, and shall be prohibited from asserting, any surcharge claim, under section 506(c) or otherwise, for any costs incurred, including those in connection with the preservation, protection, enhancement of, or realization by the Prepetition Secured Parties upon, the Collateral.

15.    <u>No Waiver of Prepetition Secured Parties' Rights; Reservation of Rights</u>. Notwithstanding any provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any Prepetition Secured Parties' rights with respect to any person or entity or with respect to any other collateral owned or held by any person or entity.  The rights of the Prepetition Secured Parties are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of:  (a) the Prepetition Secured Parties' rights under any of the Prepetition Credit Documents; (b) the Prepetition Secured Parties' rights to seek any other or supplemental

relief in respect of the Debtors; (c) the Prepetition Secured Parties' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time; or (d) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties.

16.     <u>No Liability to Third Parties</u>.  By reason of permitting the Debtors to use Cash Collateral under the terms set forth herein or in taking any other actions related to this Interim Order, the Prepetition Secured Parties (a) shall have no liability to any third party and shall not be deemed to be in control of the operations of any Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute), and (b) shall not owe any fiduciary duty to any of the Debtors, their creditors, or their estates, and shall not be party to or be deemed to be party to a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

17.     <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral (including the Prepetition Collateral), as the case may be, and proceeds or payments shall be received and applied in accordance with the Prepetition Credit Documents, notwithstanding any other agreement or provision to the contrary.

18.    <u>Section 552(b)</u>.  Upon entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

19.    <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Prepetition Secured Parties will not be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases for any claim described herein, and the Debtors' Stipulations in Paragraph F herein shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties.  Notwithstanding the foregoing, each of the Prepetition Agents, for the benefit of itself and the Prepetition Lenders, and the Prepetition Lenders are authorized, but not directed or required, in their sole discretion, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim described herein.

20.    <u>Binding Effect of Interim Order</u>.   Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee or any other Court-appointed committee appointed in any Chapter 11 Cases, and all other parties-in-interest and the respective successors and assigns of each of the foregoing, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed or elected for the estates of the Debtors or with respect to the property of the estate of any Debtors in any of these Chapter 11 Cases, any

Successor Cases, or upon dismissal of any case or Successor Case. In the event of any inconsistency between the provisions of this Interim Order and the Prepetition Credit Documents or any other order (including any "First Day" order), the provisions of this Interim Order shall govern and control. Any payments to be made by any of the Debtors under any order (including any "First Day" order) shall be made in accordance with this Interim Order.

21. <u>Survival</u>.

(a) The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (i) confirming any plan of reorganization in any of these Chapter 11 Cases; (ii) converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of these Chapter 11 Cases or any Successor Cases. The terms and provisions of this Interim Order, including, without limitation, the granting of the Adequate Protection Liens and 507(b) Claims, and the other protections granted to the Prepetition Secured Parties pursuant to this Interim Order, shall continue in full force and effect notwithstanding entry of any such order.

(b) If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacation, or stay shall not affect the validity and enforceability of the Adequate Protection Obligations granted in connection therewith, subject to Paragraph 11 hereof. Notwithstanding any such reversal, modification, vacation, or stay, any use of Cash Collateral or Adequate Protection Obligations incurred by the Debtors to the applicable Prepetition Secured Parties prior to the actual receipt of written notice by the Required First Lien Lenders of the effective date of such reversal, modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order.

(c)      Except as expressly provided in this Interim Order, the Adequate Protection Obligations and all other rights and remedies of the Prepetition Secured Parties granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired, or discharged by the entry of an order converting any of these Chapter 11 Cases to a case under chapter 7, dismissing these Chapter 11 Cases, approving the sale of any Collateral (including any Prepetition Collateral) pursuant to section 363(b) of the Bankruptcy Code or the entry of an order confirming a plan of reorganization in these Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations.  The terms and provisions of this Interim Order shall continue in these Chapter 11 Cases, in any Successor Cases, or in any superseding chapter 7 case under the Bankruptcy Code, and the Adequate Protection Obligations and all other rights and remedies of the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the Adequate Protection Obligations are indefeasibly paid in full in cash.

22.      <u>Final Hearing</u>.  The Final Hearing shall be _____, 2021, at __:__ a.m./p.m., prevailing Eastern Time.  The Debtors shall provide notice of the Final Hearing to the Notice Parties (as defined below).  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) the Debtors, 10 Briggs Drive, East Greenwich, Rhode Island 02818 (Attn: Robert Trabucco, Simon Cashman); (ii) proposed co-counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Josh A. Sussberg; Allyson B. Smith) and 300 North LaSalle Street, Chicago, Illinois 60654 (Attn: Alexandra Schwarzman), and Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801 (Attn: Domenic E. Pacitti; Michael W. Yurkewicz); (iii) the Office of the United States Trustee for the District of

Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn: David Buchbinder); (iv) counsel to the Consenting Sponsor, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Paul M. Basta; Elizabeth R. McColm; Brian Bolin; Grace Hotz) and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Pauline K. Morgan; Sean Greecher); (v) counsel to Prepetition Agents, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, GA 30309-3424 (Attn: David Wender) and local counsel to the Prepetiton Agents (if any); and (vi) counsel to any official committee appointed in these Chapter 11 Cases (collectively, the "Notice Parties"), and shall be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each case so as to be received no later than _____, 2021 at 4:00 p.m. (prevailing Eastern Time).  If no objections are timely filed, the Court may enter the Final Order without further notice or hearing.

23.    Effect of This Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

24.    Retention of Jurisdiction.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

Wilmington, Delaware
Dated: _____, 2021

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 3**

**Release, Exculpation, and Injunction Provisions**

| Release, Exculpation, and Injunction Provisions | |
|---|---|
| **Releases by the Debtors** | Notwithstanding anything contained in the Plan to the contrary, and subject to review and investigation by the Investigation Committee, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the First Lien Credit Facility, the Second Lien Credit Facility, the Third Lien Credit Facility, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Bidding Procedures, the Sale Order (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Bidding |

| | Procedures, the Sale Order (if applicable), the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan. |
| | Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtors' release. |
| **Releases by Holders of Claims and Interests** | Except as otherwise expressly set forth in this Plan or the Confirmation Order, and subject to review and investigation by the Investigation Committee, on and after the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the |

business or contractual arrangements between any Debtor and any Released Party, the First Lien Credit Facility, the Second Lien Credit Facility, the Third Lien Credit Facility, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Bidding Procedures, the Sale Order (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Bidding Procedures, the Sale Order (if applicable), the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan or any other financing document under and as defined therein) or (ii) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility documents, if any, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third-party releases are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

| | |
|---|---|
| **Exculpation** | Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from, any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Bidding Procedures, the Sale Order (if applicable), the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.<br><br>The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunction** | Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with |

4

or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Restructuring Term Sheet and the Plan.

## Exhibit 4

**Rejected Leases**

**Exhibit 1**
**Alex & Ani**
*Lease Rejection Schedule*

| Center Name | Location Address | | | | Landlord | Lessor | Lessee | Rejection Date |
|---|---|---|---|---|---|---|---|---|
| St. Louis Galleria | 1155 Saint Louis Galleria, Space #2429 | St. Louis | MO | 63117 | Brookfield | St Louis Galleria LLC | ALEX AND ANI, LLC | Petition Date |
| Chapel View | 2000 Chapel View Blvd Suite 250 | Cranston | RI | 02920 | Carpionato | Chapel Associates II LLC | ALEX AND ANI, LLC | Petition Date |
| Crabtree Valley Mall | 4325 Glenwood Ave, Space #2094 | Raleigh | NC | 27612 | CVM Property Group | CVM Holdings LLC | ALEX AND ANI, LLC | Petition Date |
| Westfield, NJ | 200 East Broad Street | Westfield | NJ | 07090 | Denton Management | Denton 200, LLC | ALEX AND ANI RETAIL, LLC | Petition Date |
| Soho | 425 West Broadway | New York | NY | 10012 | Farkas Management | 609 Realty, LLC and 574 Realty LLC | ALEX AND ANI, LLC | Petition Date |
| Irvine Spectrum | 746 Spectrum Center Drive, Space No. 746 | Irvine | CA | 92618 | Irvine Realty Company | The Irvine Company LLC | ALEX AND ANI California, LLC | Petition Date |
| Fashion Island | 1087 Newport Center Drive | Newport Beach | CA | 92660 | Irvine Realty Company | The Irvine Company LLC | ALEX AND ANI California, LLC | Petition Date |
| Arden Fair | 1689 Arden Way, Space 1044 | Sacramento | CA | 95815 | Macerich | Arden Fair Associates LP | ALEX AND ANI California, LLC | Petition Date |
| Kierland Commons | 15034 N Scottsdale Rd, Space #120G | Scottsdale | AZ | 85254 | Macerich | Kierland Greenway, LLC | ALEX AND ANI, LLC | Petition Date |
| The Oaks | 438 W. Hillcrest Drive | Thousand Oaks | CA | 91360 | Macerich | Macerich Oaks LLC | ALEX AND ANI, LLC | Petition Date |
| Santa Monica Place | 395 Santa Monica Place, Space 236 | Santa Monica | CA | 90401 | Macerich | Macerich SMP LP | ALEX AND ANI California, LLC | Petition Date |
| The Shops at North Bridge | 520 N. Michigan Ave, Space #130 | Chicago | IL | 60611 | Macerich | RN 124/125 Company LLC | ALEX AND ANI, LLC | Petition Date |
| Scottsdale Fashion Square | 7014 E. Camelback Road, Suite 1019 | Scottsdale | AZ | 85251 | Macerich | Scottsdale Fashion Square LLC | ALEX AND ANI, LLC | Petition Date |
| Mall of America | 158 South Avenue Space S158 | Bloomington | MN | 55425 | MOAC | MOAC Mall Holdings LLC | ALEX AND ANI, LLC | Petition Date |
| Square One Mall | 100 City Centre Drive, Space CRU 2-113 | Mississauga | ON | L5B 2C9 | Oxford Properties | Omers Realty Management Corporation and Square One Property Corporation | ALEX AND ANI Canada, LLC | Petition Date |
| Upper Canada Mall | 17600 Yonge St, B5D | Newmarket | ON | L3Y 4Z1 | Oxford Properties | Oxford Properties Retail Holdings II INC and CPPIB Upper Canada Mall | ALEX AND ANI Canada, LLC | Petition Date |
| Walden Galleria | 1 Walden Galleria, Space L110 | Buffalo | NY | 14225 | Pyramid Walden Company | Pyramid Walden Company LP | ALEX AND ANI, LLC | Petition Date |
| Destiny USA | 9090 Destiny USA Dr, Space B206A | Syracuse | NY | 13204 | Pyramid Walden Company | Pyramid Walden Company LP | ALEX AND ANI, LLC | Petition Date |
| Fashion Mall at Keystone | 8702 Keystone Crossing Blvd, Space #123D | Indianapolis | IN | 46240 | Simon Property Group | SDG Fashion Mall Limited Partnership | ALEX AND ANI, LLC | Petition Date |
| Stanford Shopping Center | 180 El Camino Real, Space #206B | Palo Alto | CA | 94304 | Simon Property Group | SPG Center LLC | ALEX AND ANI California, LLC | Petition Date |
| Rehoboth Beach Outlet | 36494 Seaside Outlet Dr - Suite 1420 | Rehoboth Beach | DE | 19971 | Tanger Outlet Centers | COROC/REHOBOTH III LLC | ALEX AND ANI, LLC | Petition Date |
| Sevierville Outlet | 1645 Parkway, Suite 1270 | Sevierville | TN | 37862 | Tanger Outlet Centers | Tanger Properties Limited Partnership | ALEX AND ANI, LLC | Petition Date |
| Westfield Montgomery Mall | 7101 Democracy Blvd, Space #1050, Level 1 | Bethesda | MD | 20817 | Westfield | Montgomery Mall Owner LLC | ALEX AND ANI, LLC | Petition Date |
| Westfield Santa Anita | 400 S. Baldwin Ave, Space #D11 | Arcadia | CA | 91007 | Westfield | Santa Anita Shoppingtown LP | ALEX AND ANI, LLC | Petition Date |
| Westfield Topanga | 6600 Topanga Canyon Blvd, Space #2094 | Canoga Park | CA | 91303 | Westfield | Westfield Topanga Owner LLC | ALEX AND ANI, LLC | Petition Date |

**<u>Exhibit 5</u>**

**Bidding Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ALEX AND ANI, LLC, *et al.*,[1] | ) | Case No. 21-1____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## BIDDING PROCEDURES FOR THE
## SALE OF THE DEBTORS' ASSETS

On June 9, 2021, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Delaware District (the "Court").

On [●], the Court entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving the Bid Protections, (V) Approving Contract Assumption and Assignment Procedures* [Docket No. [●]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures (the "Bidding Procedures").

These Bidding Procedures set forth the process for a potential auction (the "Auction") for the sale of substantially all of the Debtors' assets (the "Sale").[3]

To the extent that these Bidding Procedures require the Debtors to consult with the Consultation Parties (as defined below) in connection with making a determination or taking any action, or in connection with any other matter related to these Bidding Procedures or at the Auction (as defined below), if any, the Debtors shall do so in a regular and timely manner prior to making

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Alex and Ani, LLC (8360); A and A Shareholding, Co., LLC (7939); Alex and Ani International, LLC (2247); Alex and Ani Retail, LLC (1227); Alex and Ani Assembly, LLC (3215); Alex and Ani California, LLC (6368); Alex and Ani Canada, LLC (3317); Alex and Ani Puerto Rico, LLC (1477); and Alex and Ani South Seas, LLC (8592).  The Debtors' headquarters and mailing address is: 10 Briggs Drive, East Greenwich, RI 02818.

[2]    All capitalized terms used but not immediately defined shall have the meanings ascribed to them elsewhere in these Bidding Procedures.

[3]    For the avoidance of doubt, these Bidding Procedures are subject to the terms and conditions contained in any orders entered by this Court authorizing the use of cash collateral and debtor in possession financing with respect to the Debtors.

such determination or taking any such action; *provided*, however, that during any period in which a Consultation Party has submitted a Qualified Bid and has become a Qualified Bidder, such Consultation Party shall no longer be considered a Consultation Party under these Bidding Procedures.

> **Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Kurtzman Carson Consultants LLC by calling (888) 733-1434 (Domestic) or (310) 751-2633 (International) or visiting the Debtors' restructuring website at (https://www.kccllc.net/alexandani).**

## I.    Important Dates and Deadlines.

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers which in the aggregate will make the highest or otherwise best offer to purchase the Debtors' assets.  The assets will be offered for sale through an Auction.  The Debtors may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the assets in any combination.

The following is a table setting forth key dates and deadlines with respect to the Sale process:

| Event or Deadline | Date and Time[4] |
| --- | --- |
| Initial Bid Deadline | July 7, 2021 at 12:00 p.m. (prevailing Eastern Time) |
| Final Bid Deadline | August 8, 2021 at 12:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | An Auction will be held August 15, 2021 at 10:00 a.m. (prevailing Eastern Time) via remote video |
| Cure Objection Deadline | August 22, 2021, at 4:00 p.m. (prevailing Eastern Time) |
| Sale Objection Deadline | August 22, 2021 at 4:00 p.m. (prevailing Eastern Time) |
| Sale Hearing | August 26, 2021, at [●] [●].m. (prevailing Eastern Time) or as soon thereafter as the Court's calendar permits |

## I.    Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (a) serve on the Notice Parties (as defined below) a notice of the Auction and Sale

---

[4]    All dates and deadlines are subject to Bankruptcy Rule 9006.

(the "<u>Sale Notice</u>"); (b) post the Sale Notice on their restructuring website, <u>https://www.kccllc.net/alexandani</u>; (c) publish the Sale Notice, with any modifications necessary for ease of publication, in the *USA Today* and *The Providence Journal*, to provide notice to any other potential interested parties.

## II.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than any Stalking Horse Bidder and the Prepetition Secured Parties (as defined in the Cash Collateral Order))[5] interested in purchasing the Debtors' assets (a "<u>Potential Bidder</u>") must deliver or have previously delivered to the Debtors the following documents (collectively, the "<u>Preliminary Bid Documents</u>"):

    a.    an executed confidentiality agreement (a "<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtors;

    b.    preliminary proof by the Potential Bidder of its financial capacity to close the proposed transaction (which may include current audited or verified financial statements of, or verified financial commitments ("<u>Financial Statements</u>") obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;[6]

    c.    preliminary proof by the Potential Bidder of its ability to receive any and all necessary governmental, licensing, regulatory, and other approvals, and to provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such Potential Bidder, pursuant to section 365 of the Bankruptcy Code, in connection with any transaction;

    d.    identity of the Potential Bidder, including its legal name, jurisdiction and form of organization, and details regarding the ownership and capital structure of the Potential Bidder, as well as the identity of any controlling persons, significant direct or indirect equity or debt investors, and/or guarantors of such entity;

    e.    a list with the names and contact information for any financial, legal and other advisors the Potential Bidder has engaged to assist in connection with the proposed Sale; and

    f.    a description of the nature and extent of any due diligence the Potential Bidder

---

[5]    The *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* [Docket No. [●]] (the "<u>Cash Collateral Order</u>").

[6]    "<u>Consultation Parties</u>" means the Prepetition Secured Parties and any official committee appointed by the Official of the United States Trustee in these chapter 11 cases.

wishes to conduct.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate a proposed Sale. Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors shall determine and notify each Potential Bidder as to whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors may submit bids to purchase the Debtors' assets. The Debtors reserve the right to work with any Potential Bidder to cure any deficiencies in the Preliminary Bid Documents.

## III.    Non-Binding Indications of Interest.

Any party interested in purchasing the Debtors' assets (other than Prepetition Secured Parties) shall submit a non-binding indication of interest (an "Indication of Interest") on or before July 7, 2021, at 12:00 p.m. (prevailing Eastern Time) (as may be extended without notice or hearing by the Debtors, the "Initial Bid Deadline"). The Indication of Interest should (i) identify whether the party is interested in acquiring all or substantially all of the assets, (ii) set forth a proposed purchase price for the proposed transaction, including by identifying separately any cash and non-cash components of the proposed transaction consideration, which non-cash components shall be limited only to assumption of liabilities and/or credit bids, and (iii) identify any proposed conditions to closing the transaction.

Indications of Interest should be submitted to the Debtors by the Initial Bid Deadline. Note that submitting an Indication of Interest by the Initial Bid Deadline does not obligate the submitting party to submit a formal bid or to participate in the sale process and does not exempt the submitting party from also having to submit a Qualified Bid by the Final Bid Deadline to participate in the Auction, each as defined below.

## IV.    Obtaining Due Diligence Access.

Only Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors, including any Stalking Horse Bidder (if any), shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. All due diligence requests must be directed to Portage Point Partners, LLC ("Portage"). The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. Potential Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Final Bid Deadline (as defined herein) and subsequent to the Final Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Potential Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except a Potential Bidder or such Potential Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders; *provided* that the Debtors may decline to provide such information to Potential Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidders intend in good faith to, or have the capacity to, consummate any Sale. For any Bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right to withhold or modify any diligence materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

**A.      Communications with Potential Bidders (including Qualified Bidders).**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Potential Bidders and Qualified Bidders shall be through Portage Point (via email shall be acceptable).

> **Portage Point Partners, LLC, Attn.:  Matthew Ray (mray@pppllc.com) and Ryan Mersch (rmersch@pppllc.com), shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.**

**B.      Due Diligence from Potential Bidders (including Qualified Bidders).**

Each Potential Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Potential Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by a Potential Bidder (including any Qualified Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

**V.      Stalking Horse Bidders and Bid Protections.**

The Debtors shall be authorized, but not obligated, in an exercise of their business judgment to: (a) select one or more Qualified Bidders to act as stalking horse bidders in connection with the Sale (each, a "Stalking Horse Bidder"), and enter into purchase agreement with respect to a Sale with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement"); and (b) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder provide (i) a breakup fee of up to 3% of the proposed Purchase Price (as defined herein) (the "Breakup Fee"), and/or (ii) an expense reimbursement of up to $250,000 (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections"). No later than two business days after the selection of a Stalking Horse Bidder, the Debtors shall file a notice with the Court of such

selection that includes a copy of an executed and binding Stalking Horse Agreement.

The Bid Protections shall be described in detail, including the amount and calculation of such Bid Protections, in the notice of Stalking Horse Bidder.

## VI.    Bid Requirements.

To be selected to acquire the assets or to be eligible to participate in the Auction, if applicable, a Potential Bidder (other than a Stalking Horse Bidder) must deliver to the Debtors and their advisors a written, irrevocable and binding offer for purchase of the assets (the "<u>Bid</u>") that must be determined by the Debtors in their business judgment to satisfy each of the following conditions (collectively, the "<u>Bid Requirements</u>"):

a.    **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom Portage Point and Kirkland & Ellis LLP ("<u>Kirkland</u>") should contact regarding such Bid;

b.    **Identity of Assets and Purchase Price:** Each Bid must clearly state which of the assets the Potential Bidder seeks to acquire and which liabilities and obligations of the applicable Debtor(s) the Potential Bidder agrees to assume.  Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any, which non-cash components shall be limited only to assumption of liabilities and/or credit bids (collectively, the "<u>Purchase Price</u>").  The Purchase Price should be a single point value in U.S. Dollars for the total enterprise value of the assets the Potential Bidder seeks to acquire on a cash-free, debt-free basis.

c.    **Good Faith Deposit:** Each Bid must be accompanied by a cash deposit equal to ten percent of the cash consideration of such bid, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtors reserve the right to require that such Qualified Bidder (as defined below) increase its Good Faith Deposit so that it equals ten percent of the increased Purchase Price;

d.    **Markup of the Purchase Agreement:** Each Bid must be accompanied by executed transaction documents, including a draft purchase agreement, the form of which will be provided to any Potential Bidder prior to the Final Bid Deadline and in the case of an Auction with a Stalking Horse Bidder, a markup of the Stalking Horse Agreement, including the exhibits, schedules and ancillary agreements related thereto and any other related material documents integral to such Bid pursuant to

which the Potential Bidder proposes to effectuate the proposed Sale, along with copies that are marked to reflect any amendments and modifications from the form purchase agreement provided to such Potential Bidder, which amendments and modifications may not be materially more burdensome or otherwise inconsistent with these Bidding Procedures. The Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, will determine whether any such amendments and modifications are materially more burdensome;

e.   **Committed Financing:** Each Bid must include committed financing, documented to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that demonstrates the Potential Bidder has received sufficient debt and equity funding commitments to satisfy such Potential Bidder's Purchase Price and other obligations under its Bid, including the identity and contact information of the specific person(s) or entity(s) responsible for such committed financing whom Portage Point and Kirkland should contact regarding such committed financing. Such funding commitment shall not be subject to any internal approval, syndication requirements, diligence or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors;

f.   **Pro Forma Capital Structure:** Each Bid must include a description of the Bidder's pro forma capital structure;

g.   **Contingencies; No Financing or Diligence Outs:** Any Bid shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of the specified representations and warranties, which shall not be more burdensome, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, than those contemplated by the Stalking Horse Bid, if any, and each Bid must identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required.  The Potential Bidders are expected to have completed all of their due diligence by the Final Bid Deadline, including all business, legal, accounting, and other confirmatory diligence.  The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid;

h.   **As-Is, Where-Is:** Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the assets or completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement;

i.   **Authorization:** Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its shareholders and/or its board of

managers or directors, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

j.    **Adequate Assurance of Future Performance:** Each Bid must (i) identify the Contracts to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Costs related to such Contract by the Potential Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment after consultation with the Consultation Parties, that the Potential Bidder can provide adequate assurance of future performance under all such Contracts;

k.    **Government Approvals:** Each Bid, including the Stalking Horse Bid (if any), must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

l.    **Government Approvals Timeframe:** Each Bid must set forth (i) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale, and (ii) the basis for such estimate;

m.    **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment:** Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law. Each Bid must also include a written acknowledgment that the Bidder agrees to all of the terms of the Sale set forth in these Bidding Procedures;

n.    **Irrevocable:** A Potential Bidder's Bid must be binding and irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder (as defined herein);

o.    **No Fees:** Other than a Stalking Horse Bidder (solely to the extent of the Court-approved Bid Protections), each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for breakup fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided* that the Debtors are authorized in their discretion to provide the Bid Protections to one or more Stalking Horse Bidders in accordance with these Bidding Procedures;

p.    **Adherence to Bidding Procedures:** By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the sale process, or the Auction (if held), after

conclusion of the selection of the Successful Bidder (as defined herein);

q.    **Consent to Jurisdiction:** The Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the Closing, as applicable;

r.    **Backup Bid:** Each Bid shall provide that the Potential Bidder will serve as a backup bidder if the Potential Bidder's bid is the next highest or otherwise best bid;

s.    **Expected Closing Date:** A Bid by a Potential Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, after consultation with the Consultation Parties, which time frame shall include a closing by no later than 95 days after the Petition Date; and

t.    **Letters of Credit:** Any Bid must provide that the applicable bidder agrees that the obligations of any non-Debtor affiliate of the Debtors with regard to any letters of credit issued on behalf of any Debtor with respect to the applicable purchased assets will either be assumed, replaced, or continued, as applicable.

Only Bids fulfilling all of the preceding requirements contained in this section may, at the Debtors' reasonable discretion be deemed to be "<u>Qualified Bids</u>," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, be deemed to be "<u>Qualified Bidders</u>."

Within two business days after the Final Bid Deadline, the Debtors shall determine, after consultation with the Consultation Parties, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided*, *however*, that if the Debtors receive a Bid prior to the Final Bid Deadline (as defined below) that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Potential Bidder with the opportunity to remedy any deficiencies prior to the Auction. A Stalking Horse Bidder (if any) shall be deemed to be a Qualified Bidder, a Stalking Horse Bid shall be deemed a Qualified Bid, and a Stalking Horse Bidder (if any) may participate in the Auction with respect to the Debtors' assets.

## VII.    Initial Bid Deadline.

Non-binding indication of interest must be received (via email shall be acceptable) by (a) the Debtors' counsel, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Allyson B. Smith (allyson.smith@kirkland.com); and 300 North LaSalle, Chicago, Illinois 60654, Attn.: Alexandra Schwarzman (alexandra.schwarzman@kirkland.com); and (b) the Debtors' financial Advisor Portage Point Partners, LLC, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Matthew Ray (mray@pppllc.com) and Ryan Mersch (rmersch@pppllc.com), in each case so as to be **<u>actually</u>**

**received no later than 12:00 p.m. (prevailing Eastern Time) July 7, 2021 (the "Initial Bid Deadline")**.  The Debtors shall then promptly distribute any Bids received prior to the Initial Bid Deadline to the Consultation Parties.

VIII.    **Final Bid Deadline.**

Binding Bids must be received (via email shall be acceptable) by (a) the Debtors' counsel, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg,    P.C.    (joshua.sussberg@kirkland.com),    Allyson    B.    Smith (allyson.smith@kirkland.com); and 300 North LaSalle, Chicago, Illinois 60654, Attn.: Alexandra Schwarzman (alexandra.schwarzman@kirkland.com); and (b) the Debtors' financial Advisor Portage Point Partners, LLC, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Matthew Ray (mray@pppllc.com) and Ryan Mersch (rmersch@pppllc.com), in each case so as to be **actually received no later than 12:00 p.m. (prevailing Eastern Time) on August 8, 2021 (the "Final Bid Deadline")**.  The Debtors shall then promptly distribute any Bids received prior to the Final Bid Deadline to the Consultation Parties.

IX.    **Evaluation of Qualified Bids.**

Prior to the Auction (if held) the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid(s) that is, in the Debtors' reasonable business judgment after consultation with the Consultation Parties, the highest or otherwise best Bid (the "Starting Bid"). In the event a Stalking Horse Bidder is selected, the Starting Bid shall include the amount provided for in the Stalking Horse Bid, *plus* the amount of the Bid Protections, *plus* $1.0 million.  In addition, prior to the selection of the Successful Bidder, the Debtors may, in the Debtors' reasonable business judgment engage in negotiations with bidders with respect to their Bids.  For the avoidance of doubt, the Debtors, may select more than one Qualified Bid to collectively serve as the Starting Bid in an Auction (if held) if each such Qualified Bid contemplates the purchase of different assets.  In conducting the evaluation of the Qualified Bids, the Debtors will take into consideration the following non-exclusive factors:

a.    the amount of the Purchase Price of the Qualified Bid;

b.    the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates, taking into account any Stalking Horse Bidder's rights to any Bid Protections;

c.    the proposed changes or modifications to the form purchase agreement delivered in connection with such Qualified Bid and the comparative favorability of the terms set forth in such proposed purchase agreement versus any Stalking Horse Agreements, to the extent applicable;

d.    the assets and liabilities excluded from the Qualified Bid and any executory contracts or leases or other liabilities proposed to be assumed;

e.    any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities;

f.      the certainty of a Qualified Bid leading to a confirmed plan (whether the Plan or some other plan);

g.      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals; and

h.      any other factors the Debtors may, consistent with their fiduciary duties, reasonably deem relevant.

Within 24 hours of the determination of the Starting Bid, but in no event later than 24 hours before the Auction, the Debtors will (1) notify any Stalking Horse Bidder(s) as to which Qualified Bid is the Starting Bid and (2) distribute a copy of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Qualified Bidder's Good Faith Deposit within five (5) business days after the Final Bid Deadline.

## X.      No Qualified Bids.

If no Qualified Bids other than a Stalking Horse Bid (if applicable) are received by the Final Bid Deadline, then the Debtors may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid, and pursue entry of the Sale Order approving a Sale to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and designation of the Stalking Horse Bid as the Successful Bid with the Bankruptcy Court.

## XI.     Right to Credit Bid.

Any Qualified Bidder that has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; and *provided further* that any credit bid by a junior Secured Creditor shall contain a cash component sufficient to repay secured claims of a senior Secured Creditor.

Notwithstanding anything to the contrary contained herein and absent a further order of the Court, each of the Prepetition Secured Parties shall have the right to credit bid all or any portion of the aggregate amount of its applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Final Bid Deadline and complies with section 363(k) of the

Bankruptcy Code and the requirements of this section XI.

## XII.    Auction.

If one or more Qualified Bids are received by the Final Bid Deadline with respect to any applicable assets, then the Debtors shall conduct the Auction with respect to such assets. The Auction for each applicable asset shall commence on **August 15, at 10:00 a.m. (prevailing Eastern Time)**, via remote video, or such later time or other place as the Debtors determine, in which case the Debtors shall timely notify all Qualified Bidders of such later time or other place, and file a notice of the change on the Court's docket for these chapter 11 cases.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.      except as otherwise provided herein, the Auction will be conducted openly;

b.      only Qualified Bidders, including any Stalking Horse Bidders (if any), shall be entitled to bid at the Auction;

c.      the Qualified Bidders, including any Stalking Horse Bidders (if any), shall appear at the Auction via remote video or through duly authorized representatives via remote video at the Auction;

d.      only the following parties shall be permitted to attend the Auction: authorized representatives of each of the Qualified Bidders (including any Stalking Horse Bidders), the Debtors and their respective advisors, the Consultation Parties and their respective advisors, and any other creditor party who makes a written request upon the Debtors to attend the Auction; *provided* that such request shall be actually received by the Debtors' counsel no later than 24 hours prior to the commencement of the Auction; *provided further* that the Debtors reserve the right to retract their permission at any point during the Auction if such creditor party does not act in good faith and in orderly fashion during the Auction;

e.      Bids at the Auction, including any Bids by any Stalking Horse Bidder (if any), must be made in minimum increments of $500,000 (or such other amount as the Debtors may determine after consultation with the Consultation Parties) of additional value (including after payment of the Bid Protections to any Stalking Horse Bidders, if applicable);

f.      each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors;

g.      the bidding will be transcribed or recorded to ensure an accurate recording of the bidding at the Auction;

h.      no Qualified Bidder (or its representatives) may communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction, and each Qualified Bidder will be required to confirm on the record of the Auction that

12

(A) it has not engaged in any collusion, coordination, or unfair competitive practices with respect to the bidding or the Sale and (B) its Bid represents an irrevocable, binding, good faith, and bona fide offer to purchase some or all of the assets identified in such Bid if such Bid is selected as the Successful Bid or the Backup Bid (each as defined herein); *provided, however*, that two or more Qualified Bidders may coordinate to the extent they wish to provide a combined bid if the Debtors approve such coordination in their reasonable discretion;

i.    the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest Bid, subject to the Debtors' right to require last and final Bids to be submitted on a "blind" basis;

j.    the Court and the Debtors will not consider bids made after the Auction has been closed;

k.    the Debtors reserve the right, in their reasonable business judgment to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

l.    the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors following consultation with the Consultation Parties, from time to time on the record at the Auction; *provided* that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Court, (b) disclosed orally or in writing to all Qualified Bidders, and (c) determined by the Debtors to further the goal of attaining the highest or otherwise best offer for the assets, as applicable.

For the avoidance of doubt, nothing in the Auction Procedures (if an Auction is held) will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors).

## XIII.    Acceptance of the Successful Bid.

The Auction shall continue until only one Qualified Bid is the highest or otherwise best bid to purchase the Debtors' assets in the Debtors' reasonable business judgment, in a manner consistent with the exercise of their fiduciary duties, after consultation with the Consultation Parties, and outlined below in further detail, (a "Successful Bid"), and that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be acceptable to the Debtors, at which point, the Auction will be closed. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following

factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid.

Any Qualified Bidder that submits a Successful Bid will be deemed a "<u>Successful Bidder</u>" with respect to the applicable assets.  The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Bankruptcy Court.  Within five days following conclusion of the Auction and selection of a Successful Bidder, or as soon as reasonably practicable thereafter, the Debtors shall present the results of the Auction at a hearing (the "<u>Sale Hearing</u>") and shall seek Bankruptcy Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "<u>Sale Order</u>").  For the avoidance of doubt, the Sale Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Backup Bid (defined below), the Debtors shall not solicit or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one business day of the selection of the Successful Bidder, such Successful Bidder shall make a cash deposit that, when aggregated with its Good Faith Deposit, is in an amount equal to ten percent of the Successful Bid, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement.  Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XIV.  Designation of Backup Bidder.

The Qualified Bidder with the second highest or otherwise best bid or combination of bids (the "<u>Backup Bid</u>") to purchase any or all of the applicable assets (the "<u>Backup Bidder</u>") will be determined by the Debtors at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction.  If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted after the entry of the Sale Order, then the Backup Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Backup Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale with the Debtors as soon as is commercially practicable without further order of the Court, *provided* that the Debtors shall file a notice with the Court.  The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the closing of the transaction with the applicable Successful Bidder.  The Backup Bidder's Good Faith Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.

## XV.    Approval of Sale.

The Debtors will present the results of the Auction to the Court for approval at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (b) the Auction was fair in substance and procedure; (c) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (d) consummation of any Sale as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Debtors and the Debtors' assets, and is in the best interests of the Debtors and their estates.

The Sale Hearing is presently scheduled to commence on **August 26, 2021, at [●] [●].m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, before the Honorable [●], United States Bankruptcy Court for the District of Delaware.

## XVI.    Return of Good Faith Deposit.

The Good Faith Deposit of a Successful Bidder shall, upon consummation of any Sale, be credited to the purchase price paid for the applicable assets.  If a Successful Bidder fails to consummate any Sale, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors, and all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Successful Bidder.

The Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Backup Bidders will be returned within five business days after the Auction or upon the permanent withdrawal of the proposed Sale, and the Good Faith Deposit of any Backup Bidders will be returned within five business days after the consummation of any Sale or upon the permanent withdrawal of the proposed Sale.

## XVII.    Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in a manner consistent with the exercise of their fiduciary duties, and in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the Sale, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis;  For the avoidance of doubt, the Debtors reserve the right at any point prior to the selection of the Successful Bidder to terminate the Sale processes contemplated hereunder with respect to any or all of the Debtors' assets and seek to sell any or all assets pursuant to section 363(b) of the Bankruptcy Code.

## XVIII.   Consent to Jurisdiction

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any

disputes relating to the Sale, the Auction and the construction and enforcement of these Bidding Procedures, or any written indications of interest, Preliminary Bid Documents, or the Bid Documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

## XIX. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or to refrain from taking any action related to any Sale to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, through the date of the Auction, nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Debtors' assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor or any other party in interest in these chapter 11 cases (including any official committee and the United States Trustee), or any other entity regarding Alternate Proposals.

**Exhibit 6**

**Debt Transfer Settlement Term Sheet**

*Execution Version*

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and  Release ("Agreement") dated June 9, 2021, is entered into between Carolyn Rafaelian, Alex and Ani Pledge Co. (the "Assignor"), Venice Beach Walk, LLC (together with Ms. Rafaelian and Assignor, the "Rafaelian Entities"), A and A Shareholding Co., LLC and its subsidiaries that are signatories hereto (collectively, the "Company"), LC A&A Holdings, Inc. ("LC Holdings"), LC A&A Intermediate Investors, LLC ("LC Intermediate" and, together with LC Holdings, the "Lion Entities"), and The Bathing Club LLC (the "Purchaser"), each a "Party" and collectively, the "Parties."

## RECITALS

A.      WHEREAS, the Company and/or its affiliated entities intend to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on or about June 9, 2021.

B.      WHEREAS, Ms. Rafaelian and LC Holdings directly or indirectly collectively own 100 percent of the equity interests in the Company;

C.      WHEREAS, Ms. Rafaelian is a manager on the board of managers of A and A Shareholding Co., L.L.C. (the "Board of Managers");

D.      WHEREAS, on or about May 26, 2021 LC Holdings purchased and was assigned all first and third lien rights under the Credit Agreement dated as of January 29, 2016, as amended thereafter (the "First/Third Lien Credit Agreement");

E.      WHEREAS, Purchaser desires to acquire an ownership interest equal to 35% of the face amount of the first lien obligations under the First/Third Lien Credit Agreement (the "First Lien Interest");

F.      WHEREAS, the Company, Assignor, and LC Intermediate are party to that certain Second Lien Credit Agreement dated as of September 13, 2019 (as amended, the "Second Lien Credit Agreement");

G.      WHEREAS, Purchaser desires to acquire 100% of Assignor's ownership interest in the Second Lien Credit Agreement (the "Second Lien Interest");

H.      WHEREAS, pending litigation exists (i) among the Rafaelian Entities, the Company, the Lion Entities, and others in the case styled *Carolyn Rafaelian v. LC A&A Holdings, Inc., et al.*, Case No. 1:20-CV-00247 pending in the United States District Court for the District of Rhode Island (the "Rhode Island Litigation"), and (ii) between LC Holdings and the Rafaelian Entities, in the case styled *LC A&A Holdings, Inc. v. Rafaelian, et al.*; in which a judgment was entered in the New York Supreme Court, New York County, Index No.: 652546/2020, and an appeal is pending in the First Department of the New York Supreme Court, Appellate Division, No.: 2020-04616 (the "New York Appeal" and, together with the Rhode Island Litigation, the "Litigations").

1

*Execution Version*

I.    WHEREAS, in an effort to resolve the Litigations as well as other asserted and unasserted claims and defenses among all Parties, the Parties have reached an agreement on the terms set forth herein;

J.    WHEREAS, this Agreement is subject to approval of the Bankruptcy Court in all respects.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants provided herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

1.   *First Lien Interest Assignment*. LC Holdings agrees to sell and assign, pursuant to the assignment and assumption agreement substantially in the form attached hereto as <u>Exhibit A</u> the First Lien Interest to Purchaser in consideration for an aggregate purchase price of not less than ██████████████████████████████████████████████ plus all LC Holdings' accrued daily carrying costs since LC Holdings' purchase on May 26, 2021, which amount shall be payable by Purchaser to LC Holdings in cash by wire payable within three (3) business days of the Settlement Effective Date (as defined below) and which aggregate purchase price shall be calculated as of the payment date.

2.   *Second Lien Interest Assignment*.  Assignor agrees to sell and assign its interest in the Second Lien Credit Agreement to Purchaser in exchange for ████████████████ ██████████, payable by Purchaser to Assignor in cash by wire as follows: ████████ ████████████████████ payable within three (3) business days of the Settlement Effective Date (the "Initial Payment").  The balance of the proceeds shall be paid as follows and pursuant to an unconditional promissory note to be executed by the Purchaser in a form to be agreed upon by the Rafaelian Entities and the Purchaser, a personal guaranty from Mark J. Geragos, and a security agreement for real estate, stock or other commercially reasonable collateral to secure full payment of the balance to be agreed upon by the Rafaelian Entities and the Purchaser within three (3) business day of  the Settlement Effective Date: ████ ████████████████████████ payable on or before November 30, 2021 and ████████ ████████████████ due on or before January 1, 2022.

3.   *Dismissal on Pending Litigation.* The Rafaelian Entities shall dismiss the Rhode Island Litigation with prejudice and withdraw the New York Appeal with prejudice within three (3) business days of the Initial Payment (as defined below).

4.   *Settlement Effective Date.* This Agreement shall become effective upon entry of a final order by the Bankruptcy Court approving this settlement  (such date, the "Settlement Effective Date"). The Company shall use its reasonable best efforts to obtain Bankruptcy Court approval of this Agreement pursuant to Bankruptcy Rule 9019 within 35 days of execution.

5.   *Mutual Releases.*

a.    *Rafaelian Entity Release.*   Upon the Settlement Effective Date, the Rafaelian Entities, on behalf of themselves, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents, lawyers and special purpose entities, hereby releases and discharges the Company, Robert Trabucco, the Lion Entities, Lyndon Lea, Purchaser, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents and special purpose entities from any and all rights, actions, allegations, claims, debts, demands, liabilities, obligations, promises, acts, agreements, contracts, accounts, costs, expenses, damages, remedies and causes of action, whether known or unknown, suspected or unsuspected, in law or in equity, arising at any time up to and including the date of this Agreement, that the Rafaelian Entities have had, or may have as against Company, Robert Trabucco, the Lion Entities, Lyndon Lea, and Purchaser, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents, lawyers and special purpose entities, including but not limited to those relating to the matters addressed in the pleadings in the Litigations.  Notwithstanding any of the foregoing, Assignor does not release, disclaim or waive any rights it holds with respect to any indemnification obligations of the Company against third party claims.

b.    *Company, Lion Entities and Purchaser Release.*   Except for the obligations imposed by this Agreement, the Company, the Lion Entities and Purchaser, on behalf of themselves, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents, lawyers, and special purpose entities, hereby release and discharge the Rafaelian Entities, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents and special purpose entities from any and all rights, actions, allegations, claims, debts, demands, liabilities, obligations, promises, acts, agreements, contracts, accounts, costs, expenses, damages, remedies and causes of action, whether known or unknown, suspected or unsuspected, in law or in equity, arising at any time up to and including the date of this Agreement, that the Company, the Lion Entities and Purchaser has had, or may have as against the Rafaelian Entities, their predecessors, successors, heirs, executors, administrators, trusts, trustees, beneficiaries, spouses, children, assigns, former and/or current holding companies, direct and indirect affiliates, joint ventures, employees, general and/or limited partners, representatives, agents, lawyers, and special purpose

entities.  For the avoidance of doubt, the release granted by the Lion Entities herein shall not have any effect on the judgment entered by the New York Supreme Court, New York County, in the case styled *LC A&A Holdings, Inc.* v. *Rafaelian, et al.*; Index No. 652546/2020, Dkt. 27, on October 28, 2020 or any funds paid by the Rafaelian Entities to LC Holdings in satisfaction of that judgment, to which funds the Rafaelian Entities relinquish all right and claim.

c.    *Claims That Are Not Released.*  Notwithstanding anything in Section 5 to the contrary, none of the releases set forth in Section 5, regardless of the Party providing such release or the Party receiving the benefit of such release, shall apply to any continuing contractual obligations under this Agreement or the Restructuring Support Agreement, and nothing in this Agreement shall limit any Party's right to bring an action to enforce this Agreement.

d.    *Release Third Party Beneficiaries.*  The releases in this Paragraph 5 will inure to the benefit of all releasees, including non-Party releasees, and all releasees under this Paragraph 5 (including, but not limited to, Robert Trabucco and Lyndon Lea) are express third-party beneficiaries of this Agreement.

6.    *Limitation on Assignor's Representations and Warranties.* Except as provided herein, Assignor makes no representation or warranty, express or implied, to Purchaser or any other person with respect to the Second Lien Credit Agreement. Specifically, Assignor makes no representation or warranty, express or implied, to Purchaser or any other person with respect to the condition (financial or otherwise) of the Company or any other person; the existence or nature of any asset or liability of the Company; the ability of the Company or any other person to perform its obligations under the Second Lien Credit Agreement, its validity or enforceability or the effect of this Agreement upon the rights of Purchaser or any other person under the same.  The Second Lien Interest is purchased and sold "AS IS." The terms and conditions set forth herein are the result of arm's-length bargaining between parties familiar with transactions of this nature.  The price, terms and conditions reflect the fact that Purchaser shall have the benefit of, and is relying upon, no statements, representations or warranties, express or implied, made by or enforceable directly against Assignor or Assignor's affiliates or the officers, employees, consultants, appraisers, attorneys and agents of each.

7.    *Limitation on LC Holdings Representations and Warranties.* Except as provided herein, LC Holdings makes no representation or warranty, express or implied, to Purchaser or any other person with respect to the First Lien Credit Agreement. Specifically, LC Holdings makes no representation or warranty, express or implied, to Purchaser or any other person with respect to the condition (financial or otherwise) of the Company or any other person; the existence or nature of any asset or liability of the Company; the ability of the Company or any other person to perform its obligations under the First Lien Credit Agreement, its validity or enforceability or the effect of this Agreement upon the rights of Purchaser or any other person under the same.  The First Lien Interest is purchased and sold "AS IS." The terms and conditions set forth herein are the result of arm's-length bargaining between parties familiar with transactions of this nature.  The price, terms and conditions reflect the

fact that Purchaser shall have the benefit of, and is relying upon, no statements, representations or warranties, express or implied, made by or enforceable directly against Assignor or LC Holdings' affiliates or the officers, employees, consultants, appraisers, attorneys and agents of each.

8.   *Indemnity*.  Purchaser and Purchaser's successor and assigns hereby jointly and severally indemnify and hold Assignor and its affiliates and their respective officers, employees, consultants, appraisers, attorneys and agents ("Indemnified Parties") harmless from and against any and all liabilities, claims, actions or causes of action, assessments, losses, fines, penalties, costs, losses, damages and expenses, including attorney's fees (including, without limitation, contingency or similar fee arrangements) and expert witness fees, sustained or incurred by Indemnified Parties as a result of, or arising out of, or by virtue of: (a) the inaccuracy of any representation or warranty made by Purchaser herein; and (b) a breach of any covenant of Purchaser hereunder.

9.   The Parties represent and warrant that it is within their contemplation that they have or may have claims against each other as of the Settlement Effective Date, of which they have no knowledge or suspicion, but that they agree that this Agreement and the foregoing releases extend to any and all claims referred to in Paragraphs 5(a), 5(b), and 5(c) of this Agreement, regardless of whether those claims are now known, claimed, or suspected by them.  Parties expressly waive the benefit of any applicable law which, in substance, provides that a release does not extend to a claim which the releasors do not know or suspect to exist in their favor at the time of execution of a release, which if known by them must have materially affected their settlement with the releases contained in this Agreement, including without limitation California Civil Code Section 1542, which provides:  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.  The foregoing waiver was separately bargained for and is a key element of the bargain of which the Parties' releases herein are a part.

10.   *Resignation, Post-Restructuring and Competition*.  Upon execution of this Agreement, Carolyn Rafaelian shall voluntarily resign from her position on the Board of Managers of the Company.  Upon her resignation, Ms. Rafaelian shall be free to make proposals to provide the Company with new Product design and manufacturing services under a new contract between Ms. Rafaelian and the Company, it being understood that the Company is under no obligation to negotiate with Ms. Rafaelian or reach any agreement with her on terms for a new contract, and the failure to negotiate or reach any agreement with Ms. Rafaelian shall not constitute a breach of this Agreement.  Finally, the Company, Lion Entities and Purchaser hereby acknowledge that Ms. Rafaelian intends to operate a new business venture in the jewelry industry and may do so following her resignation from her position on the Board of Managers of the Company.  The Company agrees that to the extent the Noncompetition Agreement dated September 28, 2012 is still in effect, it shall terminate

concurrently with the Settlement Effective Date and that there are no other agreements or restrictions with the Company governing her ability to compete in the jewelry industry.

11.    *Non-Disparagement.* The Parties, on behalf of themselves, their agents and assigns agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage, or criticize the personal or business reputation, practices, or conduct of the other Party, including their family members, affiliate entities and/or the respective entities' past or present employees, directors, principals and officers. This Paragraph extends to statements, written or verbal, made to all news media, social media, online, investors, potential investors, any board of directors or advisory board or directors, industry analysts, competitors, strategic partners, vendors, employees (past and present) and customers. The Parties agree that this Paragraph is a material provision of this Agreement that any breach of this Paragraph shall be a material breach of this Agreement, and that the Parties would be irreparably harmed by violation of this provision.

12.    *Reclamation of Property.*  Following execution of this Agreement but in no event later than the date that is five (5) business days prior to the Settlement Effective Date, the Rafaelian Entities and the Company shall work together to determine which property currently in the Company's possession is property of the Rafaelian Entities (the "Rafaelian Property"), and which property currently in the Rafaelian Entities' possession is property of the Company (the "Company Property").  Following consummation of the Company's restructuring transaction, the Company and the Rafaelian Entities shall, at a time, location, and manner reasonably acceptable to the Company and the Rafaelian Entities, exchange the Rafaelian Property and Company Property in each Party's possession.

13.    *Legal Capacity.* The Parties represent and warrant to each other that the persons executing this Agreement are duly authorized to execute this Agreement and to give the releases and other promises contained herein.

14.    *No Admission of Liability.* Each of the Parties understands and agrees that this Agreement affects the settlement of claims which are denied and contested. Nothing contained in this Agreement is or shall be construed as an admission by any of the Parties of any liability of any kind.

15.    *No Assignment.* The Parties represent and warrant that they have not assigned, nor in any way conveyed, transferred, or encumbered, all or any portion of the claims or rights covered by this Agreement.

16.    *Costs and Attorneys' Fees.* Each Party will bear its own costs, expenses, and attorneys' fees, whether taxable or otherwise, incurred or in any way arising out of or related to the Litigation and this Agreement. The prevailing party in any court action or proceeding relating to enforcement of this Agreement shall be awarded its reasonable attorneys' fees and costs.

17.  *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of the agents, partners, successors, heirs, and assigns of the Parties.

18.  *Entire Agreement.* This Agreement is the entire Settlement Agreement of the Parties and succeeds all prior Agreements, whether oral or in writing. This Agreement cannot be modified, supplemented or amended unless agreed in advance, in writing, and signed by all the Parties. The Parties acknowledge and represent that in executing this Agreement, they have not relied upon any inducements, promises or representations made by the other Party or any entity representing or serving such other Party not already included in the Agreement.  The Parties have carefully read this Agreement and execute this Agreement of their own free will.

19.  *Interpretation.* The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any Party.  No Party shall be deemed the drafter of this Agreement. The Parties acknowledge that the terms of the Agreement are contractual and are the product of negotiations between the Parties. The Parties cooperated in the drafting and preparation of the Agreement.  In any construction to be made of the Agreement, the Agreement shall not be construed against any Party.

20.  *Confidentiality.* The Parties agree that the proposed payment terms set forth in Sections 1 and 2 of this Agreement are confidential and shall not be disclosed to any person or entity other than the Bankruptcy Court, the United States Trustee for the District of Delaware, and counsel for any statutory committee appointed in the Company's chapter 11 cases or as may be required by law.

21.  *Choice of Law and Forum Selection.* The laws of the State of New York, without giving effect to its conflict of law provisions, shall govern any dispute, claim, action or proceeding relating to or arising out of this Agreement.  The parties agree that any action to enforce the terms of this Agreement shall be brought in the court of competent jurisdiction in New York.

22.  *Counterparts.* This Agreement may be executed in multiple counterparts by the Parties hereto.  All counterparts so executed shall constitute one agreement binding upon all Parties, notwithstanding that all Parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original Agreement, all of which shall constitute one Agreement to be valid as of the date of this Agreement.  Email, executed documents scanned and transmitted electronically, and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such Email, scanned and electronic signatures having the same legal effect as original signatures.

23.  *Further Assurances.* Each of the Parties shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other arrangements and documents, as any of the other Parties may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

24.    *Waiver.* No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall such waiver constitute a continuing waiver.

25.    *Severability.* If any provision of this Agreement is determined by a Court or other tribunal of competent jurisdiction to be invalid, illegal, or unenforceable, such determination shall not affect or impair the validity, legality, or enforceability of the remaining provisions, which shall remain in full force and effect, to the extent that enforcement of the remaining provisions would be consistent with the Parties' intent, as contained in the Recitals to this Agreement.

26.    *Consultation with Counsel.* The Parties represent and warrant that they have been advised to discuss, and have discussed, this Agreement with their counsel, that they have carefully read and fully understand all of the provisions of this Agreement, and that they are entering into this Agreement voluntarily.

27.    *California Waiver.* All Parties represent and warrant that they have been informed that Mark J. Geragos, controlling member of The Bathing Club LLC, previously represented and currently represents certain Parties to this Agreement in matters unrelated to this Agreement. All Parties that are or were clients of Mr. Geragos represent and warrant that the terms of the Agreement are fair to such Parties, that the terms of the Agreement, including Mr. Geragos's role in the transactions contemplated by the Agreement, are fully disclosed to such Party in an understandable format, that the Parties are advised by independent counsel, and that the Parties, by execution of this Agreement, are providing informed written consent to the essential terms of this Agreement.

        **IN WITNESS WHEREOF**, the Parties hereby execute this Agreement.

**Company Parties' Signature Page to**
**Settlement Agreement and Release**

ALEX AND ANI, LLC
A AND A SHAREHOLDING CO., LLC
ALEX AND ANI INTERNATIONAL, LLC
ALEX AND ANI RETAIL, LLC
ALEX AND ANI ASSEMBLY, LLC
ALEX AND ANI CALIFORNIA, LLC
ALEX AND ANI CANADA, LLC
ALEX AND ANI PUERTO RICO, LLC
ALEX AND ANI SOUTH SEAS, LLC

By: _____

Name: Robert Trabucco

Authorized Signatory

[Signature pages on file with Debtors]

<u>Exhibit A</u>

Form of First Lien Interest Assignment and Assumption Agreement

**EXHIBIT A**

**FORM OF**

**Assignment and Assumption**

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "<u>Assignor</u>") and the Assignee identified in item 2 below (the "<u>Assignee</u>"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in <u>Annex 1</u> attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (a) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other Loan Documents in the amounts and equal to the percentage interests identified below of all the outstanding rights and obligations under the respective facilities identified below and (b) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Documents or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (a) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (a) and (b) above being referred to herein collectively as an "<u>Assigned Interest</u>"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. <u>Assignor</u>: LC A&A Holdings, Inc.

2. <u>Assignee</u>: The Bathing Club LLC

3. <u>Borrower</u>: Alex and Ani, LLC, a Rhode Island limited liability company

4. <u>Administrative Agent</u>: Wilmington Trust, National Association, as the administrative agent under the Credit Agreement

5. <u>Credit Agreement</u>: Credit Agreement, dated as of January 29, 2016 among the Borrower, the Guarantors, the Lenders and Wilmington Trust, National Association, as successor Administrative Agent, as amended

6. <u>Assigned Interest</u>:

| Assignor | Assignee | Facility Assigned | Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment/ Loans | CUSIP Number |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

Effective Date: [●], 2021 [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNOR:</u>

LC A&A HOLDINGS, INC.

By:_____
 Name:
 Title:

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNEE:</u>

The Bathing Club LLC

By: _____
Name: _____
Title: _____

Consented to and Accepted:

WILMINGTON TRUST

NATIONAL ASSOCIATION,

as Administrative Agent

By: _____
Name: _____
Title: _____

Consented to:

Alex and Ani, LLC

By: _____
Name:_____
Title: _____

## ANNEX 1 TO ASSIGNMENT AND ASSUMPTION

## Standard Terms and Conditions for Assignment and Assumption

1.    <u>Representations and Warranties</u>.

1.1.    <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) such Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under the terms of the Credit Agreement (subject to such consents, if any, as may be required under the terms of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the other Loan Documents as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by such Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire such Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to the terms of the Credit Agreement, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, any Assignor, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interests, including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

## EXHIBIT C

**Transfer Agreement**

  The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties, the Consenting Stakeholders and the other Parties thereto, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

  The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Credit Facility | |
| Second Lien Credit Facility | |
| Third Lien Credit Facility | |
| Existing Equity Interests | |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.